UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------X
DAMILOLA ANIMASHAUN,

        *Petitioner*,

-against-

PEOPLE OF THE STATE OF NEW YORK,

        *Respondent*.

--------------------------------------X

**MEMORANDUM AND ORDER**

21-CV-2597 (KAM)

**KIYO A. MATSUMOTO, United States District Judge:**

    *Pro se* Petitioner Damilola Animashaun ("Petitioner"), currently incarcerated in the custody of the Maryland Division of Correction[1], petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (*See* ECF No. 1, Petition for Writ of Habeas Corpus ("Pet."), at 1; ECF No. 17, Change of Address Letter.) Petitioner was convicted after a jury trial of two counts of rape in the second degree, one count of attempted rape in the third degree, and three counts of endangering the welfare of a child; and separately pleaded guilty to one count of rape in the first degree

---

[1] Petitioner was released from his New York custodial sentence on parole on August 1, 2023, but has yet to complete his ten-year New York term of post-release supervision. *See* https://nysdoccslookup.doccs.ny.gov/ (last visited Sep. 23, 2024). Publicly available Maryland Division of Corrections records reflect that Petitioner is currently in custody at Maryland Correctional Institution - Hagerstown. *See* Maryland Division of Corrections, Incarcerated Individual Locator, https://www.dpscs.state.md.us/services/inmate-locator.shtml (last visited Sep. 23, 2024).

that had been severed from the charges presented at trial.  (Pet. at 1.)  Petitioner was sentenced on October 18, 2013, to a determinate sentence of 15 years in prison, along with 10 years of post-release supervision.  (*See* ECF No. 11, Respondent's Affirmation in Opposition ("State Opp.") ¶ 125.)  The Petitioner raises 12 grounds for relief in his habeas petition.  (Pet. at 1-57.)  For the reasons set forth below, the Petition is respectfully DENIED in its entirety.

## BACKGROUND

### I.   Factual Background[2]

#### A.   Rape of Q.J.

Around 7:25pm on March 13, 2011, Detective Aubrey Henry ("Detective Henry") of the New York City Police Department ("NYPD") received information about a sexual assault that had occurred earlier on the same day.  (ECF No. 11-1, September 4-5, 2012, Suppression Hearing Transcript ("H. Tr."), at 5.)  Detective Henry subsequently went to Kings County Hospital to interview the victim, Q.J.[3]  (*Id.*)  Q.J. initially told Detective Henry at the hospital

---

[2] Because Petitioner was convicted, the court summarizes the facts in the light most favorable to the verdict.  *See United States v. Wasylyshyn*, 979 F.3d 165, 169 (2d Cir. 2020) (citing *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012)).
[3] Section 50-b of New York's Civil Rights Law requires that the identities of sexual-assault victims remain "confidential", and that no public employee make "available for public inspection" any document disclosing the victim's identity. N.Y. Civ. Rights Law § 50-b(1).  Respondent properly redacted the victims' names in the instant case pursuant to New York law, and the Court follows the same approach.  *See Scott v. Graham*, No. 16-CV-2372 (KPF)(JLC), 2016 WL 6804999, at *1 (S.D.N.Y. Nov. 17, 2016) ("numerous courts in this District and elsewhere have . . . excluded the rape victim's name from judicial documents, to protect the victim's identity").

that she had been raped at knifepoint in the rear of a cab by a person that she did not know. (*Id.* at 6.)  During a follow-up interview at the Brooklyn Special Victims Squad, however, Q.J. explained that she had been raped by a person that she knew and had met through a mutual friend – the Petitioner. (*Id.* at 7-8.) Q.J. explained that she had initially lied and said she was raped by a stranger because Petitioner had threatened to kill her and her family if she reported the incident to the police. (*Id.* at 25-26.)

Q.J stated to Detective Henry that she called Petitioner to give her a ride home from her work. (*Id.* at 7.)  When Petitioner arrived to pick up Q.J. in a blue Nissan Rogue, he told Q.J. to sit in the back seat, as he had to pick somebody up. (*Id.* at 7, 26.)  Petitioner drove Q.J. to a "place on Thomas Boyland [Street]" and parked in a parking lot, and then Petitioner exited the vehicle and entered the rear seating area of the car, where Q.J. was sitting. (*Id.* at 7-8, 26.)  Q.J. stated that at that point Petitioner physically forced her to perform oral sex on him, and then Petitioner vaginally raped Q.J. (*Id.* at 8.)

Q.J. explained to Detective Henry later that the person who raped her was named "Damil." (*Id.* at 8, 28.)  Detective Henry was able to determine that the individual's full name might be "Damilola Animashaun" and put together a flip book of pictures that were associated with that name in the NYPD's Photo Manager.

3

(*Id.*)  At that point, on March 19, 2011, Detective Henry took the flip book and met with Q.J., and Q.J. was able to positively identify Petitioner as the individual who raped her.  (*Id.* at 8-9.)  That same day, Detective Henry prepared an "I-Card[4]" on Petitioner based on Q.J.'s identification of him as her rapist. (*Id.* at 9.)

**B.  Attempted Rape of S.O.**

On the evening of March 13, 2011, sixteen-year-old S.O. was walking home when an individual driving a blue SUV--later identified by S.O. as Petitioner--approached and asked if S.O. wanted a ride.  (Trial Transcript[5] ("Tr.") at 92-94.)  S.O., who had never seen Petitioner before, initially said no, but after Petitioner asked again S.O. subsequently entered the vehicle, sitting in the front passenger seat.  (*Id.* at 94, 96.)  Petitioner began driving S.O. on Linden Boulevard in Brooklyn, explaining to S.O. that he was going to pick up his aunt, and would subsequently drive S.O. home.  (*Id.* at 96.)  Petitioner instead drove into a multi-level parking lot across the street from a movie theater,

---

[4] I-Cards are "an internal NYPD form issued by an officer when there is a suspect, witness, or perpetrator to be investigated." *Johnson v. City of New York*, No. 15-CV-1625 (SMG), 2017 WL 1476139, at *2 (E.D.N.Y. Apr. 24, 2017). There are two types of I-Cards: a "probable cause" I-Card and a "suspect only" I-Card.  *United States v. Fleming*, No. 18-CR-197 (KAM), 2019 WL 486073, at *2 (E.D.N.Y. Feb. 6, 2019).  "Probable cause [I-Cards] signal that there is probable cause for a person's arrest, whereas suspect only [I-Cards] show that the subject . . . is a person of interest."  *Id.*  The I-Card prepared by Detective Henry was a probable cause I-Card.  (State Opp. ¶ 138.)

[5] The transcript from Petitioner's trial ("Tr.") consists of ECF Nos. 11-4 through 11-10.  Citations to this transcript refer to the internal continuous pagination indicated at the top right of each transcript page.

parked in between two cars, and turned up the volume on the music playing on the vehicle's stereo system. (*Id.* at 96-97.)

Petitioner instructed S.O. to sit in the back seat of the vehicle "because his grandmother was coming in." (*Id.* at 97.) S.O. moved to the back and heard Petitioner locking the doors to the vehicle. (*Id.* at 98.) Petitioner subsequently exited the driver's seat of the vehicle and approached one of the back doors to the vehicle. (*Id.* at 98-99.) S.O. attempted to climb into the trunk of the vehicle and open the door to escape, but was unsuccessful. (*Id.* at 99-100.) When Petitioner entered the rear seating area of the vehicle, he began touching S.O.'s thigh. (*Id.* at 101.) S.O. told him not to touch her, and said she was pregnant, although she was not actually pregnant. (*Id.* at 101-02.) Petitioner pushed S.O. down onto the seat such that she was on her back, with her head facing the door opposite Petitioner, and Petitioner subsequently got on top of S.O. (*Id.* at 102.)

S.O. struggled against Petitioner, kicking and punching him in the face, as he tried to take off her belt and said "he wanted the pussy." (*Id.* at 103-04.) Petitioner subsequently punched S.O. back, and she began bleeding from her nose. (*Id.* at 104.) Petitioner stated that if S.O. bled on his car, he would shoot her. (*Id.*) S.O. was eventually able to get a door open, and flipped over, landing outside the vehicle. (*Id.* at 104-05.) S.O. began running, but realized her bag was still in the vehicle, and

5

grabbed the bag from the other side of the rear of the vehicle before running out of the parking garage. (*Id.* at 105.) S.O. ran across the street to the movie theater, and Petitioner exited the parking garage in the blue SUV, driving away on Linden Boulevard. (*Id.* at 105-07.)

S.O. ran home, told her stepfather about what happened, and her stepfather called the police, who came to her home. (*Id.* at 107-08.) S.O. spoke to NYPD Detective Jeffery Haffenden ("Detective Haffenden") about what had happened to her and provided a description of the individual who attempted to rape her and the car he was driving. (*Id.* at 108.) S.O. subsequently identified Petitioner in a lineup conducted two weeks later on March 28, 2011. (*Id.* at 109-10.)

**C.   Rape of D.Q.**

On March 10, 2011, fourteen-year-old D.Q. was walking to school along Rockaway Avenue in Brooklyn when Petitioner, driving a blue SUV, approached her. (*Id.* at 238-39.) D.Q., who knew Petitioner "from the neighborhood," got into Petitioner's car. (*Id.* at 239-40.) Although Petitioner said he would drive D.Q. to school, he instead drove past the school and turned onto Hull Street, which D.Q. said was "his block." (*Id.* at 240.) D.Q. got out of the vehicle at that point, and Petitioner walked part of the way to school with her as the two talked. (*Id.* at 241-42.) D.Q. gave Petitioner her phone number during their conversation.

6

(*Id.* at 243.)  Petitioner subsequently picked D.Q. up after school that same day in the same blue SUV and drove D.Q. home.  (*Id.* at 244-46.)  D.Q. had Petitioner drop her off a few houses down from her home, as she "didn't want him to know where I lived."  (*Id.* at 246-47.)

D.Q. continued to communicate with Petitioner via both text and voice communication in the days that followed and visited Petitioner at his home inside an apartment building on March 16, 2011.  (*Id.* at 248.)  While alone in the apartment with Petitioner, D.Q. had vaginal sexual intercourse with Petitioner twice.  (*Id.* at 249-52.)  Petitioner's mother subsequently arrived at the apartment, where she also resided, and got into an argument with Petitioner.  (*Id.* at 252.)  D.Q. left the apartment after the argument concluded.  (*Id.* at 252-53.)

D.Q. saw Petitioner again on March 18, 2011.  (*Id.* at 254.)  Petitioner drove D.Q. to a parking lot off Atlantic Avenue and told D.Q. that he wanted to have sex, and D.Q. said no and exited the vehicle.  (*Id.* at 255.)  D.Q. realized that she had left her keys in the car, however, and asked Petitioner for her keys.  (*Id.*)  Petitioner said no, and told D.Q. to get in the car, which D.Q. did.  (*Id.*)  Petitioner subsequently drove with D.Q. to his cousin's home in Coney Island.  (*Id.*)  Petitioner brought D.Q. into his cousin's apartment on the 7th floor of an apartment building, took her into a "back room," and then left.  (*Id.* at

255-56.)   D.Q. observed about eight men in the apartment as she was being brought to the back room.  (*Id.* at 256.)

While in the back room, D.Q. called her aunt, Shanna Samuels. (*Id.* at 257, 678.)  Petitioner re-entered the room, questioned who D.Q. was speaking with, and began a verbal altercation with D.Q. (*Id.*)   Petitioner became violent and choked D.Q. before getting off of her and exiting the back room.  (*Id.* at 257-58.)  Petitioner came back in the room for a second time and, while D.Q. attempted to resist, took D.Q.'s clothes off, putting the clothes in another room.  (*Id.* at 259.)   Petitioner then re-entered the room and got on top of D.Q., who was naked.  (*Id.* at 260.)  D.Q. told Petitioner to stop and tried unsuccessfully to wrestle Petitioner off.  (*Id.*) Petitioner vaginally raped D.Q., initially putting his penis into her vagina without a condom on before doing so again with a condom on.  (*Id.* at 260.)  At some point, D.Q. was able to see Petitioner's cousin through the door, and she told the cousin to get Petitioner off of her, and that she was only 14 years old.  (*Id.* at 260-61.) Petitioner told the cousin not to listen to D.Q., that D.Q. was not 14, and to get a gun.  (*Id.* at 261, 263.)

Subsequently, Petitioner got off of D.Q., and D.Q.'s cousin Shamere House called her on the phone.  (*Id.* at 261-63, 377.)  D.Q. got on the phone and asked her cousin to say how old D.Q. was, and then Petitioner spoke on the phone to D.Q.'s cousin.  (*Id.* at 261-62, 378.)   Petitioner thereafter got D.Q.'s clothes and brought

them back to her, still talking to Petitioner's cousin on the phone. (*Id.* at 263-64.)  Petitioner then drove D.Q. home. (*Id.* at 264.)  When D.Q. arrived home, she called her aunt, and D.Q.'s aunt instructed her to stay where she was, keep all of her clothes on, and not shower. (*Id.* at 265-66.)  D.Q.'s aunt said she would call the police, and the police later arrived to D.Q.'s home. (*Id.* at 266.)  D.Q. told the police what had happened, and subsequently an ambulance arrived which took D.Q. to Woodhull Hospital. (*Id.* at 266-67.)

At the hospital, D.Q. spoke to NYPD Detective Hubert Dixon ("Detective Dixon") about what happened to her. (*Id.* at 267-68.) Hospital staff also took D.Q.'s clothes from her and prepared a rape kit. (*Id.* at 368-69.)  D.Q. later met with Detective Dixon again on March 26, 2011, and drove with Detective Dixon to Hull Street, where D.Q. pointed out Petitioner's apartment building. (*Id.* at 278-79.)  D.Q. also provided a portion of Petitioner's license plate number to Detective Dixon. (*Id.* at 279.)  Based on D.Q.'s information, Detective Dixon was able to identify Petitioner as a suspect, and on March 26, 2011, put out an I-Card[6] identifying Petitioner as the suspect for the rape of D.Q. (*Id.* at 500-02.)

---

[6] The I-Card prepared by Detective Dixon was a probable cause I-Card.  (State Opp. ¶ 138.)

**D.   Petitioner's Arrest and Interview**

On March 28, 2011, Detective William Schmidt ("Detective Schmidt") of the NYPD's Brooklyn North Warrants section went to Petitioner's address on Hull Street with two other detectives. (*Id.* at 655.)  One of the detectives was in the backyard to observe the building's fire escapes, the other detective rang the doorbell to Petitioner's apartment at the entrance of the building, and Detective Schmidt stood by the door to Petitioner's apartment on the third floor.  (*Id.* at 656, 662.)  Petitioner exited the apartment quickly "like he was ready to go run up the stairs" and Detective Schmidt, who was the only detective near the door, grabbed Petitioner, brought him into the apartment, and handcuffed him.  (*Id.* at 657.)  Detective Schmidt subsequently brought Petitioner to the 73rd Precinct, arriving around 8:00am.  (*Id.* at 657-58, 672.)

Detective Alex Arty ("Detective Arty"), a detective in the 73rd Precinct, arrived to the 73rd Precinct after Petitioner had arrived.  (*Id.* at 459.)  Detective Arty, who was not the primary detective assigned to Petitioner's case and was filling in for a colleague, took time to review Petitioner's case and the outstanding I-Cards associated with Petitioner.  (*Id.* at 478.)  In addition to the rapes and attempted rapes previously described, Petitioner was also being investigated in connection with a robbery that had occurred on March 10, 2011.  (State Opp. ¶ 14.)  Detective

10

Arty reviewed surveillance footage related to Petitioner's case and spoke to witnesses and other police officers. (Tr. at 496.) At approximately 2:00pm, Detective Arty entered the interview room with a written *Miranda* form and began to review Petitioner's *Miranda* rights with him on the form. (*Id.* at 487-88.) Petitioner indicated by initialing the form that he understood his rights and was willing to answer Detective Arty's questions and signed the form. (*Id.* at 492-93.)

Also on March 28, 2011, Detective Haffenden, who had been investigating the attempted rape of S.O., received an investigative lead on the blue Nissan Rogue involved in the crime that led him to conclude that Petitioner was a suspect. (*Id.* at 716.) Upon learning that Petitioner was being held at the 73rd Precinct, Detective Haffenden went to the Precinct to speak to Petitioner at approximately 3:30pm. (*Id.* at 716-17.) Detective Haffenden was informed by Detective Arty that Petitioner had already received his *Miranda* warnings and began speaking with Petitioner at approximately 4:00pm. (*Id.* at 717-18.)

Detective Haffenden reminded Petitioner that Detective Arty had given him his *Miranda* warnings previously and showed Petitioner a copy of the signed form. (*Id.* at 719.) Detective Haffenden asked Petitioner if he was willing to be interviewed, and Petitioner said that he was willing. (*Id.*) Detective Haffenden went on to explain that he was investigating an incident that had

11

happened to "a young Spanish girl by the name of S.O." a few weeks
prior, and Petitioner stated that he "remembered an incident that
happened" and proceeded to tell Detective Haffenden about it. (*Id.*
at 720.)   Detective Haffenden summarized Petitioner's statement at
trial as follows:

> He stated in sum and substance on about Sunday, March
> 13th, he met a young Spanish woman by the name of S.O.
> He stated that he offered her a ride, she said she was
> going to her sister's house, he offered her a ride, she
> agreed, she got into his vehicle.  She stated that she
> wanted to chill with him.  They drove around for a while,
> they talked, then he drove to 790 Eldert Lane in the
> parking garage, he said he want to see if his friend
> Stevie was at home.  When he got there he found out
> Stevie was not at home so he parked in one of the spots
> inside the parking garage.  He said he was there and
> they were chilling and at some point he tried to kiss
> her twice and she said no. He stated that she didn't
> want to drink and she didn't want to smoke, she said
> that she was pregnant and she didn't want to do anything.
> At that point he stated that she became upset.  He
> thought to himself why, why would she want to get in my
> vehicle if she didn't want to do anything?  He became
> upset, pushed her out by her shoulders.  He stated that
> he never hit her and he never tried to take off her
> clothes.

(*Id.* at 720-21.)   Petitioner also explained that he was driving a
2009 Nissan Rogue at the time of the incident, and that it belonged
to his mother.  (*Id.* at 721.)   Petitioner subsequently wrote a
written statement regarding the incident which largely mirrored
what he told to Detective Haffenden, but also stated that
Petitioner "did not know how old [S.O.] was, [he] thought she was
about 20 because she stopped and talked to [him]." (*Id.* at 726-
27.)

Detective Haffenden next went to pick up S.O. so that she could view a line-up. (*Id.* at 728.)  Detective Haffenden brought S.O. to the Brooklyn Special Victims Squad at approximately 6:45pm, but Petitioner had not yet arrived from the 73rd Precinct. (*Id.* at 728-29.)  Petitioner arrived between 6:45pm and 7:25pm, and Detective Haffenden ordered food for Petitioner while he began finding "fillers[7]" for the line-up. (*Id.* at 730.)  The line-up was conducted at 9:10pm, and S.O. identified Petitioner as the person who attacked her. (*Id.* at 732, 737-38.)

While Detective Haffenden was preparing the line-up, Detective Dixon, who was investigating the rape of D.Q., entered the room where Petitioner was being held at approximately 7:45pm to speak with Petitioner. (*Id.* at 504-05.)  Detective Dixon was aware that Petitioner had previously been read his *Miranda* rights by Detective Arty. (*Id.* at 505.)  Detective Dixon reminded Petitioner of this, and then asked Petitioner if he was willing to speak with him, and Petitioner said he would. (*Id.* at 506.)  Petitioner explained that he had had sex with D.Q., but that he did not know how her age at the time. (*Id.* at 507.)  Petitioner also wrote out a written statement, which read as follows:

> [D.Q.] told me she was 18 years old when I met her.  We
> had sex the second day.  The third day we went to Coney

---

[7] Detective Haffenden testified that fillers are "persons that are placed in the line-up with the subject" and that he "tried to get individuals who were close in age with [Petitioner], close in height and physical appearance." (Tr. at 730.)

Island and had sex a second time [b]ut stopped because
my cousin came in.  When he interrupted she told me she
was 14 that['] s when I stopped and told her to show me
ID or call for verification.  She called her aunt and
she told me.  I spoke to her Aunt on the phone telling
her what happened and that I didn't know she was lieing
[sic] all that time.  I took her home safe and spoke to
her about her actions in life and told her how sorry I
was.  I was crying because she started to look like a
little sister and I told her that.  She said the reason
why she live [sic] like that is because of what her
parents put her through in life.  She told me [b]efore
I spoke to her about her actions that she can have me
arrested and claim she['] s a confused little girl.

(State Opp. ¶ 84.)  Detective Dixon placed Petitioner under arrest

after Petitioner made his statement.  (Tr. at 511-12.)

Following Detective Dixon's interview and the line-up,

Assistant District Attorney Lisa Nugent ("ADA Nugent") and

Detective Henry conducted a videotaped interview of Petitioner.

(Tr. at 830-32.)  The videotaped interview added some additional

details to Petitioner's account of the incidents involving S.O.

and D.Q., but otherwise largely mirrored his previous statements.

(State Opp. ¶¶ 89-93.)  The next day, Detective Haffenden went to

Petitioner's address at Hull Street and took photographs of a blue

Nissan Rogue that was associated with Petitioner's mother

according to DMV records.  (Id. ¶ 94.)  Several months later, on

August 18, 2011, Detective Dixon took an oral swab of Petitioner,

which was sent to the Medical Examiner's Office for examination.

(Tr. at 582-86.)

14

## II. **Pre-Trial Matters**

For his conduct regarding S.O., Petitioner was charged by Kings County Indictment Number 2607/2011, with, among other crimes, attempted first-degree rape (in violation of N.Y. Penal Law §§ 110.00, 130.35(1)), attempted third-degree rape (in violation of N.Y. Penal Law §§ 110.00, 130.25(2)), and Endangering the Welfare of a Child (in violation of N.Y. Penal Law § 260.10(1)). (State Opp. ¶ 6.)

For his conduct regarding D.Q., Petitioner was charged, by the same indictment, with, among other crimes, one count of first-degree rape (in violation of N.Y. Penal Law § 130.35(1)), for his conduct on March 18, 2011, and two counts each of second-degree rape (in violation of N.Y. Penal Law § 130.30(1)) and Endangering the Welfare of a Child, for his conduct on March 16 and March 18, 2011 (one count of both crimes for each of the two dates). (*Id.*)

For his conduct regarding Q.J., defendant was charged, by the same indictment, with, among other crimes, first-degree rape (in violation of N.Y. Penal Law § 130.35(1)). (*Id.*)

**A.    Pre-Trial *Dunaway/Wade/Huntley* Hearing**

On September 4th through 5th, 2012, a combined *Dunaway*[8]/*Wade*[9]/*Huntley*[10] hearing was held in Kings County Supreme Court. (*See generally* H. Tr.) On the first day of the hearing, the prosecution called Detective Henry, who testified as to the steps he took in investigating the rape of Q.J., Q.J.'s identification of Petitioner, and the detective's preparation of an I-Card. (*Id.* at 4-10.) Detective Henry also testified as to his interview of Petitioner at the 73rd Precinct, the fact that Petitioner had been previously given his *Miranda* rights by Detective Arty, and Petitioner's subsequent video statement at the Brooklyn Special Victims Squad. (*Id.* at 10-12, 17-22.) The prosecution also called Detective Haffenden, who testified as to his investigation of the attempted rape of S.O., his interview of Petitioner, Petitioner's written statement, and S.O.'s identification of Petitioner at the March 28, 2011, line-up. (*Id.*

---

[8] "A *Dunaway* hearing is used to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial." *Parham v. Griffin*, 86 F. Supp. 3d 161, 167 n.1 (E.D.N.Y. 2015) (internal quotation marks and citation omitted); *see Dunaway v. New York*, 442 U.S. 200 (1979).

[9] "A *Wade* hearing is held to determine if a witness's identification is tainted by unduly suggestive identification procedures." *Parham v. Griffin*, 86 F. Supp. 3d 161, 167 n.4 (E.D.N.Y. 2015) (citation omitted); *see U.S. v. Wade*, 388 U.S. 218, 232 (1967).

[10] "In New York, a *Huntley* hearing is held if the prosecution intends to offer a defendant's confession. If the confession is challenged, a hearing is held in which the prosecution has the burden of proving, beyond a reasonable doubt, that a defendant's statement was voluntary." *Thomas v. Lord*, 396 F. Supp. 2d 327, 335-36 (E.D.N.Y. 2005) (citing *People v. Huntley*, 204 N.E.2d 179 (N.Y. 1965)).

16

at 39-60.)   After Detective Haffenden's testimony, the hearing court adjourned the hearing to continue on the following day.  (*Id.* at 73.)

The combined hearing was reconvened on September 5, 2022. (*Id.* at 75-76.)   The prosecution called Detective Dixon (who had since retired from the NYPD) as their first witness, and Detective Dixon testified as to his investigation of the rape of D.Q., including his interviews of D.Q. in Woodhull Hospital, D.Q.'s subsequent identification of Petitioner's residence on Hull Street, and D.Q.'s identification of Petitioner.  (*Id.* at 77-85.) Detective Dixon also testified as to his interview of Petitioner at the Brooklyn Special Victims Squad and Petitioner's subsequent written statement regarding his interactions with D.Q.  (*Id.* at 86-92.)

The prosecution next called Detective Arty as a witness, and Detective Arty testified regarding his administration of *Miranda* warnings to Petitioner and Petitioner's indication that he was willing to speak.  (*Id.* at 103-110.)   Detective Arty testified that he became involved in Petitioner's case because Detective Cuttler, who was investigating Petitioner's potential involvement in a robbery, was "off that day."  (*Id.* at 104-05.)   During the cross-examination by Petitioner's counsel, Detective Arty

17

erroneously[11] stated that he "believe[d] . . . [Petitioner] was identified with Detective Cuttler . . . in a photo array" related to the robbery Petitioner was suspected to have committed. (*Id.* at 111-12.)  Detective Arty conceded that he could not testify "with any specific knowledge" regarding the "ID in the photo array" because the robbery case was not assigned to him, but to another detective in the precinct who was "off that day." (*Id.* at 113.)

Petitioner's counsel argued at the close of the hearing that Petitioner's statements should be suppressed because the prosecution "failed to provide any specific details . . . to find that there was probable cause to bring [Petitioner] in" as a suspect for the robbery. (*Id.* at 115.)  Petitioner's counsel argued that there was "no attenuation" between the arrest and Petitioner's statements, and therefore the statements should be suppressed. (*Id.* at 116-17.)  The prosecution argued in response that Petitioner was arrested "based on three I-cards," notwithstanding any issues with the robbery I-card, including two I-cards related to the rape of D.Q. and Q.J. (*Id.* at 118-19.) The prosecution also argued that Petitioner was not handcuffed during the interviews, was offered food, and was reminded that he

---

[11] Respondent notes that Detective Cuttler's report instead "stated, in part, that the complainant in the robbery case told the detective both that the robber was wearing a mask that covered his face and that the complainant could not identify the robber." (State Opp. ¶ 135.)

18

had been administered his *Miranda* rights prior to each successive interview. (*Id.* at 119-20.)

The hearing court ultimately found the testimony of the prosecution's witnesses credible, and found that, regarding the issue of probable cause, there were "three [I-cards] issued . . . based on information obtained by three separate detectives" and erroneously stated that Defendant was "picked up on a warrant[12]." (*Id.* at 121-28.) Based on the court's findings, the court found that the NYPD "had probable cause to arrest upon the information known to them at the time of arrest." (*Id.* at 129.) The hearing court also found that the prosecution demonstrated and met its burden of showing that Petitioner's statements were voluntary and not the product of illegal conduct or coercion, and that the line-up was not unduly suggestive. (*Id.* at 130-31.) Accordingly, the hearing court declined to suppress the line-up identification or any of Petitioner's statements. (*Id.* at 131.)

**B.   Severance Motion and Hearing**

Following the combined suppression hearing, Petitioner's counsel moved on October 16, 2012, to sever the counts relating to each of the separate alleged rape victims, arguing that a joint trial would unfairly prejudice Petitioner. (State Opp. ¶ 34.) The severance motion further argued that each case was factually

---

[12] As noted by the Respondent, Petitioner was not actually "picked up on a warrant." (State Opp. ¶¶ 135, 138.)

distinct, and that the defenses Petitioner intended to rely on for each of the criminal acts were "irreconcilably in conflict with each other." (*Id.* ¶¶ 34-35.)  The prosecution opposed Petitioner's severance motion on November 13, 2012, arguing that the charges in the indictment were properly joined and that there was no likelihood of prejudice if the charges were tried together.  (*Id.* ¶ 36.)

An *ex parte* conference was held on December 11, 2012, in which Petitioner's counsel further argued to the court regarding the prejudicial impact of a single trial, and offered further details on Petitioner's potential defenses at trial.  (*See* ECF No. 11-2, December 11, 2012, Hearing Transcript.)  During the *ex parte* conference, Petitioner's counsel argued that Petitioner "would not be testifying" with regards to Q.J., but would have to argue "two separate completely distinct defenses" with regards to S.O., who was a stranger to him, and D.Q., with whom Petitioner was acquainted.  (*Id.* at 9-10.)  Petitioner's counsel also noted that Petitioner's DNA was found on Q.J., who was not underage, but that defense counsel would argue the encounter was consensual.  (*Id.* at 17.)  The hearing court closed the *ex parte* conference by noting that the transcript would be sealed "until or unless there is an appeal."  (*Id.*)

On December 14, 2012, the hearing court issued a decision severing the counts regarding Q.J., but otherwise denied the

20

severance motion.  (State Opp. ¶ 39.)  The court explained that "a reasonable jury could clearly separate and understand the different, fact[-]based defenses defendant might raise" regarding D.Q. and S.O., and that even though the defenses differed, they were not inconsistent or in conflict with one another.  (*Id.*) Following the court's decision, Petitioner again moved to sever the D.Q. and S.O. charges on March 8, 2013, arguing that, with the severance of the Q.J. charges, Petitioner would need to "refrain from testifying" about S.O., and therefore, severance would be appropriate for the two underage victims.  (*Id.* ¶ 40.)

On the same day as Petitioner's motion was submitted, the court held a hearing, and heard arguments from Petitioner's counsel regarding severance of the charges relating to D.Q. and S.O.  (ECF No. 11-3, March 8, 2013, Hearing Transcript.)  Petitioner's counsel argued that "there really are salient reasons why [Petitioner] would refrain from testifying on one complainant and testifying as to the other."  (*Id.* at 2.)  The court, after considering the arguments of Petitioner's counsel, explained that "for the reasons I stated in the original decision, I'm going to reaffirm my original decision which was severing the one, [Q.J.], and leaving the other two [D.Q. and S.O.] together."  (*Id.* at 3.)  Petitioner's counsel noted an objection for the record.  (*Id.*)

## III. Trial

Opening statements for Petitioner's trial were delivered on June 13, 2013. (Tr. at 33.) The prosecution called as witnesses (1) Leezette Green, a Department of Motor Vehicles representative who testified regarding the blue Nissan Rogue and Petitioner's address; (2) Kim Moment, an employee of the New York City Criminal Justice Agency who testified as to Petitioner's post-arrest interview; (3) S.O.; (4) Derrick Londano, an EMT with the Fire Department of New York ("FDNY") who responded to S.O.'s 911 call and testified as to her injuries; (5) D.Q.; (6) Shamere House, D.Q.'s cousin, who testified as to her phone call with D.Q. on March 18, 2011, described *supra*; (7) Dr. Walter Raza, a physician in the emergency pediatric department of Brookdale University Hospital who treated S.O.; (8) Donna Hernanez, an employee of Sprint Communications who authenticated phone records and testified as to their contents; (9) Barbara Samuel, D.Q.'s aunt who D.Q. called to report she had been raped; (10) Detective Arty; (11) Detective Dixon; (12) Detective Schmidt; (13) Shanna Samuel, D.Q.'s aunt, who testified as to her phone call with D.Q. on March 18, 2011, described *supra*; (14) Detective Haffenden; and (15) Detective Henry. (*Id.* at 42-859.) The prosecution closed by reading into the record the birth certificates of S.O. and D.Q., establishing the victims' dates of birth and their ages circa March 2011. (*Id.* at 860-61.)

22

Prior to S.O.'s testimony, Petitioner's counsel requested permission to cross-examine S.O. regarding her plea of guilty to second-degree robbery. (*Id.* at 73-74.) S.O. pleaded guilty to second-degree robbery and petit larceny in 2012 and was participating in a program that would result in her robbery charge being dismissed, after successful completion of the program, in favor of a youthful offender adjudication. (*Id.*) S.O.'s attorney for the criminal matter was present for her testimony, and the trial court questioned S.O.'s attorney as to whether S.O. might assert her Fifth Amendment rights if questioned regarding the robbery case. (*Id.* at 77.) S.O.'s counsel argued that it was appropriate for S.O. to invoke her Fifth Amendment rights because the appellate waiver included as part of S.O.'s guilty plea might be invalidated on direct appeal if the youthful offender adjudication did not work out. (*Id.* at 77-78.) Petitioner's counsel objected, noting that there had been a "full allocution" as part of S.O.'s guilty plea. (*Id.* at 79.)

The trial court ultimately concluded that "because a possibility exists that [S.O.'s] plea could be vacated [on] appeal" it was not final yet, and therefore "her right against self incrimination still exists." (*Id.* at 81.) Petitioner's counsel objected again, but the trial court did not modify the ruling. (*Id.* at 81-82.) S.O.'s attorney was present during her testimony, and while S.O. admitted to pleading guilty to robbery, she invoked

23

her Fifth Amendment rights when asked about the nature of the robbery. (*Id.* at 202-03.)

Separately during the trial, the prosecution moved to preclude Petitioner's counsel from presenting evidence that DNA testing showed semen from an unidentified male donor was found on D.Q.'s jeans. (*Id.* at 452-53.) The prosecution argued that the evidence was barred by New York's Rape Shield law. (*Id.*) Petitioner's counsel objected, arguing that the evidence was relevant and "goes directly to [his] theory on the case that somebody else's DNA was on her." (*Id.* at 453.) The court noted that the evidence was problematic because the DNA expert was not able to state when the sample appeared on the jeans, and so "we don't know if that DNA for that other person happened on [the same day as D.Q.'s rape]." (*Id.* at 453-54.) Ultimately, after further argument by the parties, the court concluded that the evidence was barred by the Rape Shield law because there was "no evidence that anyone else was involved in intercourse with the victim from this incident," D.Q. testified that her clothes were removed and in another room at the time of the rape, and DNA experts could not state when the semen was deposited. (*Id.* at 565-68.)

At the close of the prosecution's case, counsel for Petitioner moved to dismiss the indictment against Petitioner for failure to present a prima facie case against him. (*Id.* at 863.) The basis for this motion was S.O.'s failure to identify Petitioner at trial,

24

notwithstanding her earlier line-up identification, contradictory statements made by D.Q. that rendered her testimony "incredible as a matter of law," and a lack of evidence of physical injury to S.O. (*Id.* at 863-65.)  The trial court denied Petitioner's motion, stating that sufficient evidence had been presented to set forth a prima facie case and that D.Q.'s credibility was a matter for the jury, but reserved judgment on the assault counts. (*Id.* at 866-68.)

The defense called one witness to testify – Petitioner. (*Id.* at 870.)  Petitioner denied ever encountering S.O., and denied ever interacting with D.Q. prior to his arrest in March 2011. (ECF No. 11-11, Transcript of Petitioner's Trial Testimony ("Pet. Tr."), at 4-5.)  Petitioner also denied ever speaking with D.Q. on the phone.  (*Id.* at 6.)  Petitioner further testified that Detective Arty showed him a *Miranda* waiver but never read the rights on the form to him. (*Id.* at 9.)  Petitioner testified that another unidentified detective grabbed him and demanded that Petitioner sign the form. (*Id.* at 11-12.)  Petitioner testified that he eventually signed the form because Detective Arty "told me he was going to help me out." (*Id.* at 14.)  Petitioner testified that afterwards the various detectives, including Detectives Haffenden and Dixon, asked him to fabricate a story and that Petitioner agreed to do so because it would help him get home.

25

(*Id.* at 15-23.)   Petitioner claimed that everything in his video statement was similarly "made up."  (*Id.* at 26.)

The defense rested after the conclusion of Petitioner's testimony, and Petitioner's counsel renewed the motion to dismiss, which was again denied.  (Tr. at 941-42.)  Following summations by the defense and prosecution, the jury was subsequently instructed on the elements of attempted rape in the first degree, attempted rape in the third degree, endangering the welfare of a child, rape in the first degree, and rape in the second degree.  (*Id.* at 945-1056.)

Ultimately, on June 26, 2023, the jury convicted Petitioner of attempted rape in the third degree (as to S.O.), endangering the welfare of a child (three counts, one as to S.O. and two as to D.Q.), and rape in the second degree (two counts, both as to D.Q.), and acquitted him of attempted rape in the first degree (as to S.O.) and rape in the first degree (as to D.Q.).  (*Id.* at 934-935, 1096-98.)

**IV.  Guilty Plea and Sentencing**

On August 5, 2013, Petitioner appeared to be sentenced for his trial convictions, but the sentencing court noted that Petitioner "still had the outstanding count against the other victim" pending, referring to the charges arising out of the alleged rape of Q.J.  (ECF No. 11-12, August 5, 2013, Plea Transcript ("Plea Tr.").)  The court noted that it had previously

26

"conveyed an offer of ten years to run concurrent" with any sentence imposed in the D.Q. and S.O. matters, and asked if the Petitioner wished to "avail himself of that." (*Id.* at 2-3.) Petitioner's counsel noted that Petitioner was considering a plea in the matter "to avoid consecutive jail sentences." (*Id.* at 3-4.) Petitioner's counsel asked for a sentence of less than ten years as to the remaining unresolved charges, but the court declined to modify the offer. (*Id.* at 4-6.) Ultimately, Petitioner accepted the court's offer to plead guilty to rape in the first degree as to Q.J., based on the promised ten year concurrent sentence. (*Id.* at 6.) The prosecution objected to the sentence being imposed concurrent to the sentences from the trial. (*Id.* at 6-7.)

Petitioner was subsequently sworn and the court began to instruct Petitioner as to the consequences of entering a guilty plea. (*Id.* at 8-12.) During the guilty plea allocution, the court asked Petitioner if it was true that he forcibly had intercourse with Q.J., and Petitioner initially stated "[t]hat's not true, but I plead guilty." (*Id.* at 13.) The court warned Petitioner "if it's not true, I am not accepting the plea. So you will go to trial on this matter." (*Id.*) Petitioner subsequently said "[t]hat's true. That's true." (*Id.*) The court further explained the situation to Petitioner:

> THE COURT: I am going to tell you something . . . [I]f you chose right now to go to trial in this court, whether it came before me or anyone else, you would get a fair trial in this matter and I have not drawn any conclusions on it. When you come and you plead guilty, you have to discuss that with your attorney and be sure that you were willing to plead guilty for what I have said. I'm not about to take a plea that you have any reservations on because that is not justice and I am here to give you a trial if you want one and accept your plea if that's your decision. So you are not doing the Court any favor, you are not doing yourself any favor. You discuss it.
>
> If there is any more hesitation, believe me the Court will allow you to take your plea back and I will guarantee that you will have a fair trial in this matter because I want your plea to be knowing, voluntary, you know what you are doing and you are either admitting to it or you are not. Talk it over with your attorney and we will go over this one more time.

(*Id.* at 13-14.)   Petitioner's counsel subsequently informed the court that Petitioner was ready to proceed, and the Petitioner admitted to having had forcible sexual intercourse with Q.J.  (*Id.* at 14.)   The court asked Petitioner one additional time if there was "any doubt in your mind as to whether you wish to plead guilty?" (*Id.*)   Petitioner replied "[n]o."  (*Id.*)

Petitioner's sentencing as to all his convictions was conducted on October 18, 2013.  (*See* ECF No. 11-13, October 18, 2013, Sentencing Transcript ("Sent. Tr.").)   When asked if he wished to be heard, Petitioner stated "[n]o. Not really" but subsequently made a statement after conferring with his counsel, arguing that "what I said on the video statement was not rape." (*Id.* at 10-11.)   Petitioner was sentenced to consecutive seven

28

year sentences on the two counts of rape in the second degree as
to victim D.Q., a consecutive one year sentence on the count of
attempted rape in the third degree as to victim S.O., concurrent
one year sentences on the three counts of endangering the welfare
of a child, and a concurrent ten year sentence for the rape of
Q.J. in the first degree charge, plus ten years of post-release
supervision.  (*Id.* at 14-25.)

**V.   Post-Sentencing Appeals and Collateral Attacks**

**A.   Collateral Attacks**

Just over three years after Petitioner's sentencing, he began
submitting the first of what would become many collateral attacks
on his conviction and sentence.  Ultimately, Petitioner submitted,
at the time of the Respondent's answer to his Petition: four New
York Criminal Procedure Law ("CPL") § 440.10 Motions, two CPL §
440.20 Motions, and two petitions for a writ of state habeas
corpus.  (State Opp. ¶¶ 126-51.)  The Court summarizes Petitioner's
arguments made in the collateral attacks on his conviction and
sentence as follows:

- The conviction should be vacated because Petitioner was
  arrested without probable cause, in violation of the
  Fourth Amendment, and therefore his subsequent custodial
  statements should have been suppressed.  (First CPL §
  440.10 Motion, Second CPL § 440.10 Motion, First State
  Habeas Petition, Third CPL § 440.10 Motion.)

29

- The sentence should be set aside because he should have received concurrent, not consecutive, sentences on the two second degree rape counts of conviction. (First CPL § 440.20 Motion, Second CPL § 440.20 Motion.)

- The line-up identification of Petitioner by S.O. was unduly suggestive because officers improperly told S.O. to disregard certain physical features of the individuals in the line-up. (Third CPL § 440.10 Motion, Fourth CPL § 440.10 Motion, Second State Habeas Petition.)

- D.Q.'s identification of Petitioner from a single photograph was illegal and thus could not serve as probable cause for his arrest. (Third CPL § 440.10 Motion, Fourth CPL § 440.10 Motion, Second State Habeas Petition.)

- Petitioner's confession was coerced. (Third CPL § 440.10 Motion, Fourth CPL § 440.10 Motion, Second State Habeas Petition.)

- Because Petitioner was released on bail pursuant to an arrest in Maryland at the time that he was investigated by the NYPD for rape and attempted rape, and Petitioner was later acquitted at a bench trial for the Maryland offense, the evidence obtained by the NYPD should be

30

suppressed as the fruit of a violation of the Fourth Amendment. (Fourth CPL § 440.10 Motion, Second State Habeas Petition.)

- The trial court improperly precluded Petitioner's counsel from introducing evidence regarding semen on D.Q.'s clothing. (Fourth CPL § 440.10 Motion, Second State Habeas Petition.)

- The DNA evidence on D.Q.'s jeans should be re-tested in order to determine the date on which the semen was deposited. (Fourth CPL § 440.10 Motion.)

- The evidence did not establish that Petitioner intended to have sexual intercourse with S.O. (Second CPL § 440.20 Motion.)

- Petitioner was actually innocent. (Second CPL § 440.20 Motion.)

All of Petitioner's collateral attacks on his conviction and sentence that were reviewed were rejected by the reviewing courts as either procedurally barred, meritless, or both. (*Id.* ¶¶ 126-51.) Petitioner moved to appeal some, but not all, of the denials to the Appellate Division, and in each case, permission to appeal was denied. (*Id.* ¶¶ 129, 149.) At the time of Respondent's answer to the Petition, Respondent was "not aware" of any ruling on Petitioner's first state habeas petition, and Petitioner's second

31

state habeas petition and second CPL § 440.20 motion were pending
in Kings County Supreme Court. (*Id.* ¶¶ 142, 150, 151.) Petitioner
also refers to a separate state habeas petition in Oneida County
Supreme Court that was denied on May 28, 2019, in the Petition.
(Pet. at 5.)

Petitioner also moved pursuant to CPL § 440.30(1-a) for the
re-testing of DNA evidence recovered from the jeans that D.Q. had
been wearing on March 18, 2011. (State Opp. ¶ 147.) Petitioner's
motion was denied because the DNA evidence had been previously
tested before trial, and Petitioner failed to establish that there
was a reasonable probability that the verdict would have been
different if the DNA had been retested. (*Id.* ¶ 148.)

**B.   Direct Appeal**

In addition to the collateral attacks described *supra*,
Petitioner also appealed in June 2018, represented by counsel, to
the Second Department on the basis that (1) the trial court
improperly denied Petitioner's severance motion, thereby depriving
him of his right to a fair trial, and (2) the preclusion of the
semen evidence deprived Petitioner of his right to present a
defense. (ECF 11-18, Petitioner's Main Appellate Brief
("Appellant Br."), at 36, 52.) Petitioner's appeal also requested
that should the Appellate Division reverse any of Petitioner's
trial convictions, "it should also vacate [Petitioner]'s
conviction upon his guilty plea to first - degree rape" related to

32

Q.J., because the guilty plea was "induced by a promise that its sentence would run concurrently with the sentence for the trial counts." (*Id.* at 51, 61.)

Subsequently, Petitioner submitted a *pro se* supplemental brief to the Appellate Division, arguing that (1) the hearing court erred in declining to suppress Petitioner's statements made after his arrest; (2) D.Q.'s identification was illegal as it was based on a single photograph; (3) Petitioner's guilty plea regarding Q.J. should be vacated because his statements regarding Q.J. should have been suppressed; (4) Petitioner did not receive effective assistance of counsel because his counsel did not object to the presence of S.O.'s lawyer during her testimony, and because his counsel did not argue Petitioner was arrested without probable cause at the suppression hearing; (5) Petitioner was denied the right to a fair trial because of the presence of S.O.'s lawyer during her testimony; and (6) Petitioner was denied the right to a fair trial because the trial court allowed Detective Haffenden to testify about S.O.'s identification of Petitioner after S.O. failed to identify Petitioner in the courtroom.   (ECF 11-20, Petitioner's Supplemental Appellate Brief ("Appellant Supp. Br."), at 14-21.)

On August 5, 2020, the Appellate Division affirmed Petitioner's conviction. *People v. Animshaun*[13], 128 N.Y.S.3d 580, 581 (2d Dep't 2020). Regarding Petitioner's argument that the trial court improperly denied the motion to sever the counts related to D.Q. from those related to S.O., the Appellate Division held that joinder was appropriate pursuant to CPL § 200.20(2)(b) because of "the remarkable similarity in the manner in which the crimes against both complainants were committed," and the court therefore "lacked the statutory authority to sever them" pursuant to CPL § 200.20(3). *Id.* The Appellate Division also held that contentions made[14] in Petitioner's counseled brief about "certain remarks made by the Prosecutor in her opening statement and summation" and the jury charge were "unpreserved for appellate review and, in any event, without merit." *Id.* Regarding the determination to exclude evidence of a semen stain not belonging to Petitioner found on the jeans of D.Q., the Appellate Division held the trial court properly excluded the evidence pursuant to CPL § 60.42, New York's Rape Shield law. *Id.* The Appellate Division explained that:

---

[13] The Appellate Division misspelled Petitioner's name in the caption, repeating an error that was made by Petitioner's appellate counsel in the case caption for his initial appellate brief. (*See* Appellant Br. (cover page caption reads "Damilola Animshaun, *Defendant-Appellant*").)

[14] As part of the arguments made regarding the severance issue, Petitioner's counsel argued that the prosecutor "capitalized on the joinder by alluding to the similarity between the crimes" and that "the jury was not directed to consider the proof as to each case separately." (Appellant Br. at 37, 48-50.)

> There was no evidence as to when or how the semen was
> deposited on the jeans, or who the source of the semen
> was. Without more, the presence of the semen was properly
> determined to be irrelevant, and the defendant's
> speculation as to when and how the stain was deposited,
> and whether the jeans were washed before the offenses
> occurred, was insufficient to overcome the exclusion of
> evidence of the semen pursuant to the Rape Shield Law.

*Id.* (citing *People v. Wieners*, 821 N.Y.S.2d 658 (2d Dep't 2006); *People v. Rendon*, 756 N.Y.S.2d 229 (2d Dep't 2003); *People v. Mount*, 727 N.Y.S.2d 819 (3d Dep't 2001)).

Turning to Petitioner's claims raised in his *pro se* supplemental brief, the Appellate Division held that (1) the trial court properly "allow[ed] a detective to testify that one of the complainants had identified the defendant in a lineup, where the complainant was unable to identify the defendant in court due to lack of present recollection"; (2) Petitioner's "contention that he received ineffective assistance of counsel is without merit" because "counsel provided meaningful representation"; and (3) Petitioner's remaining contentions, including regarding the denial of the motion to suppress his statements to law enforcement, were unpreserved for appellate review and without merit. *Id.* at 581-82.

Petitioner requested permission to appeal the Appellate Division's order to the New York Court of Appeals. (ECF No. 4-13, Petitioner's Application for Leave to Appeal.) The New York Court of Appeals denied Petitioner's application for leave to

appeal on October 29, 2020.  *People v. Animshaun*, 158 N.E.3d 524 (N.Y. 2020).

## VI.  Petitioner's Extradition to Maryland

As briefly noted *supra,* Petitioner is currently incarcerated in the custody of the Maryland Division of Correction.  The Court takes judicial notice of Maryland state court records to provide a brief overview of Petitioner's current incarceration, which does not otherwise relate to the current habeas Petition beyond the Court's analysis regarding whether the Petition is moot, discussed *infra*.  *See Bristol v. Nassau County*, 685 F. App'x 26, 28 (2d Cir. 2017) ("decisions in related state criminal proceedings" are "self-authenticating, publicly available records [which] satisf[y] [Fed.] Rule [Evid.] 201(b)(2)").

On August 10, 2011, Petitioner was charged in Maryland state court with first-degree rape, second-degree sexual offense, and second-degree assault, and an arrest warrant was issued. *Animashaun v. State*, 2022 WL 4533812, at *2 (Md. Ct. Spec. App. Sept. 28, 2022).  The charges arose out of the April 5, 2010, rape of B.D. in Pikesville, Maryland.  *Id.* at *1.  In July 2011, after receiving notice from New York state officials that DNA recovered from B.D. matched Petitioner[15], Baltimore County Police detectives

---

[15] Petitioner discusses the DNA match to the Maryland case in his eleventh ground for relief in the instant Petition, relating to the constitutionality of the New York DNA swab.  (*See* Pet. at 53.)

36

traveled to New York with a warrant to obtain DNA from Petitioner. *Id.* at *2. Petitioner was charged with rape, as noted above, after the DNA collected by the detectives matched swabs taken from B.D. *Id.*

An arrest warrant was issued for Petitioner on August 10, 2011, and the warrant was lodged as a detainer against Petitioner in New York. *Id.* at *4. On July 12, 2019, Petitioner invoked his rights under the Interstate Agreement on Detainers ("IAD") to seek final disposition of the Maryland charges pending against him. *Id.* Thereafter, on September 12, 2019, Petitioner was transported to Maryland, and he was subsequently indicted on October 7, 2019. *Id.* at *5. Trial was postponed to allow additional time for defense counsel to prepare, and subsequently due to the COVID-19 pandemic. *Id.* Petitioner's trial ultimately took place in May 2021 as a bench trial, and the trial court convicted Petitioner on all three counts. *Id.* at *2. Petitioner was sentenced to twenty years on the count of second-degree rape, consecutive to Petitioner's New York sentence for the convictions that are the basis of this habeas Petition. *Id.* at *1.

Separate from the above rape charges, Petitioner was also the subject of a February 2011 bench warrant from a Maryland state court for a traffic violation – driving without a license. (Pet. at 76.) The bench warrant was issued after Petitioner failed to appear on February 14, 2011, after being released on bail on

37

October 29, 2010.  (*Id.*)  When Petitioner was extradited to Maryland, a bench trial was held on the traffic violation on November 4, 2019, and Petitioner was found not guilty.  (*Id.* at 74.)

## VII. The Instant Petition

On May 6, 2021, Petitioner filed the instant application seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (*See generally* Pet.)  Petitioner includes twelve separate grounds for relief in the Petition, largely renewing claims made in his previous collateral attacks and direct appeal.  (*Id.* at 26-57.)  The Respondent filed its answer, the state court record, and its memorandum of law in opposition on October 28, 2021.  (*See* ECF No. 11, Respondent's Answer and Attachments.)  Petitioner filed a letter on November 18, 2021, which was dated November 10, 2021, stating that he received the Respondent's answer on November 9, 2021.  (ECF No. 12, Letter from Petitioner.)  Based on this Court's scheduling order dated August 9, 2021, Petitioner's reply was due within 30 days of the filing of Respondent's answer, or November 28, 2021 (the next business day after November 27, 2021).  (*See* Docket Order dated August 9, 2021.)  Petitioner did not file a reply before November 28, 2021, or at any point thereafter.

<u>STANDARD OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's

38

habeas petition to give deference to a state court's decision on the merits.  28 U.S.C. § 2254(d).  A federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.*; *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) "identifies the correct governing legal [rule]" but unreasonably applies it to the facts of the petitioner's case.  *Id.* at 412-13.  The Court reviews the last reasoned state court decision in the case.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000).  The state court's factual determinations are presumed to be correct, and the

39

petitioner bears "the burden of rebutting that presumption [] by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

State procedural default or failure to exhaust state court remedies will operate as a bar to review unless the petitioner can (1) establish cause for his or her default and actual prejudice resulting from the alleged violation of federal law, or (2) demonstrate that the failure to consider the petitioner's claims would result in a fundamental miscarriage of justice.  *See Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002).

A petitioner can fulfill the cause requirement for default in two related ways.  First, the petitioner can demonstrate that "some objective factor, external to Petitioner's defense, interfered with his ability to comply with the state's procedural rule." *Gutierrez*, 702 F.3d at 111 (internal citation omitted). Alternatively, the petitioner can establish cause by demonstrating futility — specifically, that "prior state case law has consistently rejected a particular constitutional claim." *Id.* at 112 (quoting *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006)).  To establish prejudice, the petitioner must demonstrate that the alleged error resulted "in "substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions." *Id.* (internal quotation marks and citation omitted).

Even if the petitioner is unable to establish cause and prejudice, the court may excuse the procedural default if the petitioner can show that a fundamental miscarriage of justice would result, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (internal citations omitted). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (alteration in original) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

In reviewing the instant petition, the court is mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotations and citations omitted); *Williams v. Kullman,* 722 F.2d 1048, 1050 (2d Cir. 1983) (noting that "courts should review [pro se] habeas petitions with a lenient eye"). Consequently, the court is obliged to interpret Petitioner's pleadings as raising the strongest arguments they suggest. *See Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009).

A petitioner can seek federal habeas corpus relief only after he exhausts state court remedies and thus provides the state courts a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842

41

(1999).  In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it."  *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

**DISCUSSION**

As discussed above, Petitioner asserts twelve separate grounds for habeas relief in his Petition.  (*See generally* Pet.)  Because some of Petitioner's claims overlap with one another, or implicate separate constitutional rights, the Court will analyze Petitioner's claims in the groups into which Respondent organized them.  (*See* ECF No. 11, Respondent's Memorandum of Law[16] ("State Mem.").)  Before analyzing the merits of Petitioner's claims, however, the Court will first consider whether Petitioner, who has completed his custodial New York sentence, meets the "in custody" requirement for this Court to have jurisdiction over his Petition before proceeding to the Petition's claims.

## I.  Jurisdiction - the "In Custody" Requirement

"The federal habeas statute gives the United States district courts jurisdiction to entertain petitions for habeas relief only from persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Maleng v. Cook*, 490

---

[16] Respondent's Memorandum of Law is included in the same file as Respondent's Affirmation in Opposition, and begins on page 68 of the file.  (*See* State Mem.)  The Court utilizes the internal pagination in the Memorandum for pincites.

U.S. 488, 490 (1989) (quoting 28 U.S.C. § 2241(c)(3) (emphasis in original) and citing 28 U.S.C. § 2254(a)).  The Supreme Court has "interpreted the statutory language as requiring that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time his petition is filed."  *Maleng*, 490 U.S. at 490-91 (citing *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968)).

Here, Petitioner has been released from his New York custodial sentence, as discussed *supra*.  However, at the time Petitioner filed his habeas petition, he was incarcerated pursuant to the New York sentence, despite having been extradited to Maryland.  Therefore, he fulfills the "in custody" requirement of 28 U.S.C. § 2254.

Moreover, Petitioner remains under a term of post-release supervision.  "Post-release supervision, admitting of the possibility of revocation and additional jail time, is considered to be custody" for purposes of a habeas petition brought under 28 U.S.C. § 2254.  *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (citing *Jones v. Cunningham*, 371 U.S. 236, 240-43 (1963) (holding that parole satisfies the "in custody" requirement of habeas petitions; "the custody and control of the Parole Board involves significant restraints on petitioner's liberty because of his conviction and sentence, which are in addition to those imposed by the State upon the public generally"); *Peck v. United States*, 73 F.3d 1220, 1224 n.5 (2d Cir. 1995) ("[Defendant] has completed his

43

prison term since his petition was denied . . . and is presently
serving a three-year term of supervised release. Although he is no
longer in prison, a term of supervised release, which carries with
it the possibility of revocation and additional jail time,
satisfies the 'in custody' requirement of § 2255") (citations
omitted)). Because Petitioner challenges his convictions[17], and
not merely his sentence of imprisonment, his Petition is not moot,
and the Court may therefore proceed to analyzing his claims. *See
United States v. Probber*, 170 F.3d 345, 348 (2d Cir. 1999) ("The
Supreme Court has long held that a challenge to a criminal
conviction itself presents a justiciable case or controversy even
after the expiration of the sentence that was imposed as a result
of the conviction.")

## II.  Fourth Amendment Claims

The Court will first examine Petitioner's first, second, and
eleventh grounds for relief, all of which relate to the Fourth
Amendment.  Petitioner's first claim[18] is that his arrest was
unconstitutional because there was no probable cause to arrest
him, and he did not give the detectives consent to enter his
apartment. (Pet. at 28-31.)  As part of Petitioner's second claim,
which will be discussed further *supra*, Petitioner claims that

---

[17] With the exception of Petitioner's excessive sentence claim, discussed *infra*
in Discussion Section IV.B.
[18] Petitioner later repeats the same argument at the end of his tenth claim.
(Pet. at 52-53.)  Because the arguments overlap completely, the Court's analysis
in this section applies to both.

D.Q.'s identification of him based on a single photograph was illegal and therefore could not serve as probable cause for his arrest. (*Id.* at 31-33.) Petitioner's eleventh claim is that his DNA was collected without a warrant, in violation of his Fourth Amendment rights. (*Id.* at 53-55.) The first and second claims were presented in Petitioner's CPL § 440.10 motions, and Petitioner's claim regarding the DNA swab has not yet been presented to any state court. (State Opp. ¶ 153.)

For the reasons set forth below, Petitioner's fourth amendment claims are not cognizable on habeas review and are therefore dismissed.

**A.   Legal Standard for Fourth Amendment Claims on Habeas Review**

In *Stone v. Powell*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 494 (1976) (internal footnote omitted). Under *Stone v. Powell*, the threshold and key inquiry for habeas courts confronting a Fourth Amendment claim became whether the petitioner was denied the opportunity to litigate a Fourth Amendment claim "fully and fairly," such that his due process rights could be said to have been violated. *Id.*

45

As explained by the Second Circuit, such a denial of due process may be found to have occurred only where (a) the state provided "no corrective procedures" to redress the claimed Fourth Amendment violations, or (b) "the state [] provided a corrective mechanism, but the [petitioner] was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citing *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977)); *see White v. West*, No. 04-CV-02886 (RRM), 2010 WL 5300526, at *13 (E.D.N.Y. Dec. 6, 2010) ("Indeed, the federal habeas court's role is not to inquire into the merits of the state court decision; rather, a federal court 'need only find that the State's procedure for resolving Fourth Amendment claims is 'facially adequate' and that no 'unconscionable breakdown' of the process occurred in the petitioner's case.'") (quoting *Munford v. Graham*, No. 09-CV-7899 (DLC) (AJP), 2010 WL 644435, at *15 n.24 (S.D.N.Y. Feb. 24, 2010), *report and recommendation adopted*, 2010 WL 2720395 (June 29, 2010), *aff'd*, 467 F. App'x 18 (2d Cir. 2012)).

"A disruption or obstruction of a state proceeding could create an 'unconscionable breakdown' in process." *Grant v. Gonyea*, No. 19-CV-00743 (AJN) (DF), 2021 WL 8087868, at *12 (S.D.N.Y. Oct. 21, 2021), *report and recommendation adopted*, 2022 WL 1173341 (S.D.N.Y. Apr. 20, 2022) (internal quotation marks and citation omitted). Such a breakdown, however, "must be one that calls into

46

serious question whether a conviction [has been] obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (noting, as examples, the bribing of a state court judge, the government's knowing use of perjured testimony, and the use of torture to extract a guilty plea), *aff'd*, 852 F.2d 59 (2d Cir. 1988) (*per curiam*).

"Where a habeas petitioner cannot show either that he was never afforded a corrective process for a claimed Fourth Amendment violation, or that there was an unconscionable breakdown in that process, his underlying Fourth Amendment claim will not be cognizable on habeas review." *Grant*, 2021 WL 8087868, at *13 (internal citation omitted.

### B. Discussion

Though Petitioner challenges the correctness of the suppression ruling, he does not contend – nor could he – that the hearing court failed to provide "corrective" procedures to redress what he alleges was an illegal arrest, and to contest the prosecution's arguments that his statements should not be suppressed. The hearing court held a lengthy combined *Dunaway/Wade/Huntley* Hearing, at which four witnesses testified, and Petitioner's counsel argued forcefully that Petitioner was arrested without probable cause and his statements should be suppressed. (*See generally* H. Tr.) After considering the

47

evidence, the hearing court issued a ruling on the record that set out the reasons for declining to suppress Petitioner's statements. (*Id.* at 121-31.)  Petitioner subsequently sought review of the suppression ruling in several CPL § 440.10 motions, and on direct appeal.

The federal courts have repeatedly "approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate." *Capellan*, 975 F.2d at 70 n.1 (citations omitted).  In light of the above-recited history of this case, Petitioner was plainly afforded access to those procedures to remedy the alleged Fourth Amendment violation that arose from his allegedly illegal arrest. *See, e.g., Nunez v. Conway*, 923 F. Supp. 2d 557, 568 (S.D.N.Y. 2013) (dismissing Fourth Amendment claim where "the trial court conducted a suppression hearing on [the petitioner's] probable cause and suggestive identification claims . . . [and] the petitioner then litigated those claims before the Appellate Division and sought review from the Court of Appeals").

Thus, having taken advantage of existing state procedures for the review of his Fourth Amendment claim, Petitioner can only argue that those procedures suffered an "unconscionable breakdown." *See White*, 2010 WL 5300526, at *13 ("Here, since it is clear that corrective process was available, federal habeas review of Petitioner's Fourth Amendment claim will lie only if he demonstrates an 'unconscionable breakdown' in the state's

48

procedure for litigating those issues."). Construed liberally, the Court reads the Petition as arguing that Detective Arty's incorrect testimony, and the hearing court's incorrect conclusion that a warrant had been issued, constitutes an "unconscionable breakdown" in the state's procedures. (Pet. at 29.) The Court agrees with Respondent, however, that no such conclusion is warranted.

As an initial matter, courts in this circuit have found that "alleged perjury does not constitute an unconscionable breakdown in the suppression hearing process." *Wallace v. Artus*, No. 05-CV-0567 (SHS)(JCF), 2006 WL 738154, at *7 n.6 (S.D.N.Y. Mar. 23, 2006). Furthermore, it does not appear from the record that Detective Arty actually did testify untruthfully as to any matters. Detective Arty stated at the suppression hearing that he "believe[d]" that Petitioner had been identified in a photo array prior to the issuing of the I-Card for the robbery, but that he "wasn't involved in that portion" as it "wasn't [his] case." (H. Tr. at 111.) When asked about the identification procedures, Detective Arty explained that he had "tried to contact the detective" but agreed that he could not testify with any specific knowledge regarding "the ID in the photo array." (*Id.* at 113.) Finally, given that Petitioner was also the subject of two separate probable cause I-Cards for rape, regarding D.Q. and Q.J., (State Opp. ¶ 138), the Court finds that any error in Detective Arty's

49

testimony could hardly be considered an "unconscionable breakdown" in the suppression hearing process.  The hearing court's incorrect statement that a warrant had been issued, which was not supported by the testimony presented at the hearing, likewise does not constitute an "unconscionable breakdown" given the presence of probable cause for Petitioner's arrest.

The record demonstrates that Petitioner used the procedures available in New York to contest the alleged Fourth Amendment violations—that he was arrested without probable cause—raised in his Petition and he cannot establish that an unconscionable breakdown in the state processes prevented him from presenting his claims.  For these reasons, Petitioner's Fourth Amendment claims are dismissed.

## III. Claim Regarding D.Q.'s Identification

Petitioner's second claim is that D.Q.'s identification of him from a single photograph did not qualify as a confirmatory identification and therefore was unduly suggestive.  (Pet. at 31-33.)  Petitioner further argued that the identification therefore could not support a finding of probable cause for his arrest, which the Court discussed in the Fourth Amendment claims section, *supra*.  (*Id.* at 33.)  Petitioner previously advanced this same claim in his *pro se* supplement submitted as part of his direct appeal.  (*See generally* Appellant Supp. Br.)  The Appellate Division rejected Petitioner's argument as unpreserved for appellate review.

50

*Animshaun*, 128 N.Y.S.3d at 582.  Although the Appellate Division denied Petitioner's claim on the merits, its primary reliance on state procedural law constituted an independent ground for its decision.  *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (state court decision that relies on a procedural rule to dismiss a claim, but which, in the alternative, also proceeds to dismiss the claim on the merits, relies on the independent state law ground for dismissal); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810 n. 4 (2d Cir. 2000) (noting that when a state court opines that a claim is "not preserved for appellate review" and then rules "in any event" that the claim also fails on its merits, the claim rests on independent state law rule which precludes federal habeas review).  The Court finds that Petitioner's claim is procedurally barred, and even if it could be reviewed, is without merit.

   **A.   Procedural Bar**

   Federal courts generally will not consider a federal issue in a case "if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (alteration and emphases omitted).  Nonetheless, "the state law ground is only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state."  *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (citing *Lee*, 534 U.S. at 376).  "Further,

in certain limited circumstances, even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'" *Id.* at 713-14 (citing *Lee*, 534 U.S. at 376). In New York state courts, there are two separate ways in which a question of law can be preserved for appeal:

> The first is through an objection at trial by a party later claiming error. N.Y. Crim. Proc. Law § 470.05(2). The second is when the trial court makes an express ruling with regard to a particular question. *Id.*

*Id.* at 714. "New York courts consistently interpret [CPL] § 470.05(2) to require that a defendant specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify any error." *Id.* at 715; *see also People v. Martin, 409 N.E.2d 1363, 1365 (N.Y. 1980)* (defendant's failure to the raise same argument in his suppression motion that he later raised on direct appeal foreclosed appellate review of the claim).

Petitioner did not advance the photographic identification claim as part of his motion to suppress evidence, or otherwise argue that D.Q.'s identification was illegal at the suppression hearing. (State Opp. ¶ 30; H. Tr. at 114-17.) Therefore, under New York's firmly established and regularly followed rule, his claim could not be raised for the first time on appeal. *Garvey,* 485 F.3d at 716. Evaluating the factors set forth in *Cotto v.*

*Herbert*, the Court further finds that application of the state ground would not be exorbitant.  331 F.3d 217, 240 (2d Cir. 2003). Perfect compliance could have had an impact on the trial court's decision, as "the trial court would have had the opportunity to consider" his argument that the identification was unduly suggestive, and did not provide probable cause for arrest. *Garvey,* 485 F.3d at 719.  Furthermore, New York caselaw indicates that compliance with the rule was demanded in the specific circumstances presented. *See Martin*, 409 N.E.2d at 1365.  Finally, Petitioner did not just violate the formal requirements of CPL § 470.05(2), but instead, "[h]e violated the very substance of the rule" given the entire purpose for the rule is to give a trial court "a fair opportunity to rule on an issue of law before it can be raised on appeal." *Garvey*, 485 F.3d at 720.  Accordingly, the Court finds that application of the procedural bar is not exorbitant in Petitioner's case, and Petitioner has not established cause or prejudice to excuse the procedural bar.

**B.  Merits**

Even if Petitioner's claim were not procedurally barred, it is nonetheless without merit.  D.Q., identified Petitioner by stating "[t]hat's him" when Detective Dixon showed her a photograph of Petitioner.  (H. Tr. at 83.)  There is no question that the identification procedure was suggestive, as D.Q. was shown only a single photograph of Petitioner.  In situations where an

53

identification procedure was suggestive, a Court "must then determine whether the identification was nonetheless independently reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). A Court makes such an assessment based on the totality of the circumstances, weighing five factors:

> (1) a witness's opportunity to view a criminal during the crime, (2) the witness's degree of attention, (3) the accuracy of any prior description of the criminal by the witness, (4) the level of certainty demonstrated by the witness at the time of the confrontation, and (5) the length of time between the crime and the confrontation.

*Wiggins v. Greiner*, 132 F. App'x 861, 864-65 (2d Cir. 2005) (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)); *see also Raheem,* 257 F.3d at 135 (noting that no one factor is dispositive).

Applying these principles to the instant case, the Court concludes from the totality of the circumstances evidenced by both the suppression hearing and trial transcript that D.Q. had a sufficient independent basis for making a reliable identification. Petitioner was someone that D.Q. knew "from the neighborhood," she interacted with him extensively on at least four occasions, and D.Q.'s confident identification of Petitioner took place less than 10 days after she was raped. (H. Tr. at 83; Tr. at 239-65.) In conclusion, because there is an ample record demonstrating that D.Q. had a strong independent basis for making a reliable identification, Petitioner's claims that the identification procedure utilized was unduly suggestive is meritless. Because

Petitioner's claim regarding D.Q.'s identification is procedurally barred and without merit, it does not warrant habeas relief and is dismissed.

## IV. Double Jeopardy and Excessive Sentence Claim

Petitioner's third ground for habeas relief is that he was "prosecuted on 2 counts of the same charge," referring to his rape in the second degree convictions, and then "unduly sentenced to such counts consecutively." (Pet. at 34.) Petitioner further claims that "14 years . . . is excessive." Respondent notes that Petitioner raised both of the above claims in his first state habeas petition, along with his second CPL § 440.20 motion, both of which had not been adjudicated as of the date of Respondent's answer. (State Mem. at 9.) Notwithstanding the fact that Petitioner's claims are unexhausted, the Respondent asks the Court to deny the claims on the merits. Finding Petitioner's claims to be plainly without merit, the Court exercises its discretion to deny the claims on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Velazquez v. Poole*, 614 F. Supp. 2d 284, 311 (E.D.N.Y. 2007) ("Thus, with the passage of AEDPA, the court is now given discretion to deny unexhausted claims on the merits, although it is not required to do so.").

### A.   Double Jeopardy

The Double Jeopardy Clause guarantees that "[n]o person shall ... be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  This "command encompasses three distinct guarantees," protecting against (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (quoting *Illinois v. Vitale*, 447 U.S. 410, 415 (1980)).  Although Petitioner does not clearly specify the basis for his claim, only the third protection is at issue in the instant case.

Petitioner's claim fails because the two counts of rape in the second degree for which he was punished were based on Petitioner's two separate instances of sexual intercourse with D.Q. on March 16, 2011, and March 18, 2011, respectively. (*See* Tr. at 1080-83 (trial court explained to the jury that count four related to Petitioner's conduct on March 16, 2011, and count seven related to Petitioner's conduct on March 18, 2011).)   Although the two rapes were perpetrated against the same victim, there were significant "temporal and spatial differences between the rapes . . . [and thus] each rape was a separate and distinct offense, not the product of a single criminal incident." *Moore v. Irvin*, 908 F. Supp. 200, 205 (N.D.N.Y. 1995).

56

New York courts have repeatedly held that multiple rapes of the same victim over a period of time constitute separate and distinct offenses and are punishable as such. *See People v. Jiminez*, 657 N.Y.S.2d 735, 736 (2d Dep't 1997) ("Multiple rapes of the same victim are not a continuing offense. Each act of intercourse is a separate and distinct offense."); *see also People v. Hobbs*, 127 N.Y.S.3d 565, 567 (2d Dep't 2020) (trial court did not err in imposing consecutive terms of incarceration because "the acts constituting each crime were separate and distinct, took place on different dates, and thus, did not constitute a single sexual assault"). Therefore, because Petitioner's rape of D.Q. on March 16 and March 18 constituted two separate offenses, his separate punishment for each crime does not violate the Double Jeopardy Clause.

**B.    Excessive Sentence**

Petitioner's claim that his sentence was excessive does not provide a basis for habeas relief and is, in any event, moot. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."); *see also Williams v. Schneiderman*, 409 F. Supp. 3d 77, 80 (E.D.N.Y. 2017) ("Courts have repeatedly held that challenges to the validity of a sentence are mooted by the expiration of that sentence." (internal quotation marks omitted) (collecting cases)). As Petitioner's custodial

sentence for his New York convictions, which was within the range prescribed by statute[19], is now expired, the only remaining relief would be a reduction in his term of post-release supervision. Courts in this circuit have repeatedly concluded that such relief is not available, because "the controlling statute on post-release supervision, N.Y. Penal Law § 70.45, does not appear to reduce the length of a supervised release term because of unlawful excess time served in prison." *Bomasuto v. Perlman*, 680 F. Supp. 2d 449, 460–61 (W.D.N.Y. 2010); *see also Williams,* 409 F. Supp. 3d at 81. Because Petitioner's claim that his sentence was excessive is both without merit and moot, it is denied and dismissed.

## V.   Claim Regarding S.O.'s Identification

Petitioner's fourth claim is that S.O.'s line-up identification of him was invalid because, among other things, S.O. did not get a very good look at her assailant, and Detective Haffenden told S.O. to "disregard" skin complexion when she was reviewing the line-up. (Pet. at 34-38.) Petitioner previously advanced similar claims in his *pro se* supplemental brief to the Appellate Division. (Appellant Supp. Br. at 20-21.) As with Petitioner's claims regarding D.Q.'s identification, the Appellate Division rejected Petitioner's argument as unpreserved for appellate review. Animshaun, 128 N.Y.S.3d at 582.

---

[19] Rape in the Second Degree is a Class D Felony.  N.Y. Penal Law § 130.30.  A Class D Felony is punishable by up to seven years in prison.  *Id.* § 70.00(2)(d).

The Court need not belabor the analysis regarding the procedural bar in this case. For the same reasons as explained above regarding Petitioner's claims as to D.Q.'s identification, Petitioner's claim that S.O.'s identification was invalid is procedurally barred based on an independent and adequate state ground, and application of that bar is not exorbitant here. Detective Haffenden testified in depth regarding the line-up procedures at the suppression hearing, describing the filler individuals utilized and the process by which S.O. was brought to view the line-up. (H. Tr. at 53-60.) Detective Haffenden explained that he told S.O. to "look carefully at each individual" but not to "pay attention to complexion and hair and stuff like that [as those] are things that are subject to change." (*Id.* at 59.) Petitioner's counsel did not challenge the line-up procedures at the suppression hearing, focusing instead on the *Miranda* warnings and whether probable cause for Petitioner's initial arrest existed. (*Id.* at 115-17.) Accordingly, Petitioner did not comply with New York's preservation rules, and he has not offered any cause or prejudice to permit this Court to overlook the procedural bar.

Even if Petitioner's claims regarding the line-up itself were not procedurally barred, they are nonetheless without merit. To the extent Petitioner is suggesting that there were differences in complexion between himself and the fillers in the line-up,

59

"[d]ifferential in skin color between lineup participants does not violate due process." *Roldan v. Artuz*, 78 F. Supp. 2d 260, 273 (S.D.N.Y. 2000). Furthermore, Petitioner's claims that S.O. did not get a good look at him are clearly belied by the trial record. On cross-examination, Petitioner's counsel asked S.O. if she got a "good look" at the individual attempting to rape her when she was "in the back seat," and S.O. responded "[y]es." (Tr. at 189.) Based on this "good look," S.O. was able to provide a description to Detective Haffenden of her assailant as being "male black, approximately 20, 21 years of age, light skinned to medium skin complexion, approximately 5' 6", 5' 7" feet tall with a low Caesar haircut." (*Id.* at 713.)

The fact that the initial complaint report prepared by police officers responding to S.O. initially described the perpetrator as a 6'1" tall white male Hispanic does not warrant a different conclusion. (*Id.* at 751.) Petitioner's counsel utilized that alleged inconsistency in summation, (*id.* at 951), and cross-examined S.O. on the topic, (*id.* at 189). S.O. denied ever having identified her attacker as a "male Hispanic" at trial. (*Id.* at 189.) The alleged inconsistency in S.O.'s description of her assailant between the first group of police officers and Detective Haffenden provides no basis for a finding that the line-up procedure was unduly suggestive. The Second Circuit has explained that "[a] lineup is unduly suggestive as to a given defendant if

60

he meets the description of the perpetrator previously given by the witness and the other lineup participants plainly do not." *Raheem v. Kelly*, 257 F.3d at 134.   Petitioner makes no argument regarding the appearance of the fillers in the line-up, and therefore his argument that the line-up was unduly suggestive fails.   Petitioner's claim is denied because it is procedurally barred, and even if it could be reviewed, it is without merit.

**VI.  Claim Regarding Trial Court's Question to S.O.**

The Court next turns to Petitioner's claim regarding an erroneous statement made by the trial court during questioning of S.O., which is included as part of Petitioner's fourth ground for habeas relief.  (Pet. at 38.)  Petitioner argues that the trial court made a "negligent error" by mistakenly referring to S.O.'s assailant as "the defendant" when asking a question of S.O., and therefore habeas relief is warranted.   Respondent argues that Petitioner's claim is procedurally defaulted because it was not made as part of his direct appeal to the Appellate Division.  The Court agrees that Petitioner's claim is procedurally defaulted, and that even if it could be reviewed, it is without merit.

**A.  Procedural Default**

"Where a petitioner has failed to exhaust his federal claims, but the state court to which he must present those claims would find them procedurally barred, a federal habeas court must deem the claims to be exhausted and procedurally defaulted." *Kimbrough*

*v. Bradt*, 949 F. Supp. 2d 341, 353 (N.D.N.Y. 2013) (citing *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008)). Petitioner did not raise the claim regarding the trial court's erroneous statement in his direct appeal, despite his counsel's objection and motion for a mistrial in the trial court. As a result, Petitioner may no longer obtain review of this claim in state court. Petitioner cannot raise this claim in a second direct appeal, because a defendant is entitled to only one direct appeal under New York law. *See Aparicio v. Artuz*, 269 F.3d 78, 90-91 (2d Cir. 2001). Petitioner cannot raise this claim in a motion to vacate his judgment of conviction pursuant to Criminal Procedure Law § 440.10, because, in a 440.10 proceeding, a court is required to deny a claim if the claim could have been raised on direct appeal. *See* CPL § 440.10(2)(c) (a court must deny a CPL § 440 claim if sufficient facts appeared on the record to have permitted the claim to be reviewed on direct appeal). Because Petitioner has already filed an appeal, and the claim regarding the trial court's erroneous statement could have been raised in that direct appeal, and was not, any such claim Petitioner now wishes to bring is procedurally defaulted.

**B.  Merits**

Notwithstanding the procedural default, Petitioner's claim is without merit. *See* 28 U.S.C. § 2254(b)(2) (a federal court may proceed to deny an unexhausted habeas claim if it is apparent that

the claim is without merit).  During S.O.'s testimony, the trial court asked S.O. "[w]hen you went back to get your purse, where was the defendant?"  (Tr. at 105.)  At that point, S.O. had not identified the Petitioner as her assailant in court.  The Court subsequently struck the remark from the record and issued the following curative instruction:

> THE COURT: Objection is sustained.  Inadvertently the Court said defendant. There is no mention that the defendant -- that that was the defendant. So the Court is referring only to the person, not the defendant, not the person on trial. That was an error of the Court. It does not reflect that the Court has an opinion. It was just that the Court inadvertently made that reference.

(*Id.* at 106.)  Petitioner's counsel subsequently asked for a mistrial, but the trial court explained that while the remark was an "error . . . it is not an error with the curative instruction that arises to the point of mistrial."  (*Id.* at 143-45.) Petitioner's counsel subsequently consulted with her client, and then requested a further curative instruction. (*Id.* at 145.)  The Court subsequently provided a further instruction to the jury that "[t]here has been no testimony that the defendant is the person who committed any crime and there has been no identification of any sort as to that so you are not considering that at all at this point." (*Id.* at 148.)  Petitioner's counsel did not object to the curative instruction.

On habeas review, the Court employs an "actual prejudice" analysis, wherein an error is harmless if it did not have a

"substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Here, the trial court immediately recognized its error, instructed the jury to disregard the statement, and issued a curative instruction. Subsequently, after discussion with the parties, the trial court issued a further curative instruction to the jury prior to resuming the trial. On this record and considering the evidence of his guilt presented at trial, Petitioner cannot show that the trial court's erroneous remark caused him actual prejudice. Accordingly, and because the trial court's error was minor and two curative instructions were issued, habeas relief is unavailable to Petitioner on this claim.

## VII. Claims Regarding S.O.'s Attorney's Presence at Trial

Petitioner's fifth ground for relief is that the trial court improperly permitted S.O.'s attorney to speak with S.O. during her testimony. (Pet. at 38-39.) Petitioner does not specify how this consultation deprived him of his constitutional right to a fair trial. (*Id.*) Respondent argues that Petitioner's claims is meritless because S.O. properly invoked her Fifth Amendment rights, and there is "no reason to believe that defendant was unduly prejudiced in any way because of the communications between S.O. and her attorney during her examination." (State Mem. at

18.)   This Court agrees and finds Petitioner's claim to be meritless.

As discussed supra in Background Section III, S.O.'s attorney was present for her testimony, and S.O. occasionally consulted with her counsel regarding whether it was appropriate for her to answer questions regarding crimes to which she had pleaded guilty. (*See, e.g.*, Tr. at 86.)  The parties and the trial court discussed the best method for S.O. to consult with her attorney, and Petitioner's counsel objected to "allowing the attorney to initiate conversation with the witness." (*Id.* at 91.)  Under New York law, an individual convicted of a crime who may pursue (or is pursuing) a direct appeal "remain[s] at risk of self-incrimination until [s]he exhaust[s] [her] right to appeal." *People v. Cantave*, 993 N.E.2d 1257, 1262 (N.Y. 2013).  As a result, S.O. properly invoked her Fifth Amendment right against self-incrimination, notwithstanding her guilty plea to the robbery charges, which could potentially have been appealed.  Therefore, the trial court did not err in allowing S.O. to assert her Fifth Amendment rights.

To the extent Petitioner believes that the trial court erred in the manner in which it allowed S.O. to consult with her attorney, he has failed to point to any resultant "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.  To the extent Petitioner believes S.O. was being "coached" by her attorney, the Supreme Court has noted

that "[t]here are other ways to deal with the problem of possible improper influence on testimony or 'coaching' of a witness short of putting a barrier between client and counsel." *Geders v. United States*, 425 U.S. 80, 89 (1976).  Indeed, Petitioner's counsel utilized the presence of S.O.'s attorney to impeach her credibility in summation:

> This woman [S.O.] gets arrested for Robbery in the Second Degree, she pleads guilty to Attempted Robbery in the Second Degree and a misdemeanor charge of petit larceny, she pleads guilty to those things and when I ask her, well, can you tell us what happened there, what was the deal, what was this all about? She takes the Fifth Amendment. She has her attorney, she steps out, she talks to her attorney, she comes back, I take the Fifth Amendment, I plead the Fifth. Listen, you can evaluate that, she wanted to take the Fifth, she took the Fifth, she didn't want to answer the question. You can evaluate that.

(Tr. at 952.)  As a result, Petitioner's counsel was able to "develop a record which the [attorney] in closing argument [could] exploit by raising questions as to the [witness's] credibility." *Geders*, 425 U.S. at 89-90.  On this record, the Court finds no prejudice to Defendant, and therefore habeas relief is not warranted.

Furthermore, to the extent Petitioner is renewing the claim from his supplemental *pro se* appellate brief that his counsel was ineffective for failing to further object to S.O.'s consultations with her attorney, Petitioner's claim is likewise without merit. (Appellant Supp. Br. at 20.)  Because the Court has already

concluded that the trial court did not err in allowing S.O. to consult with her attorney, any failure by Petitioner's counsel to further object to the arrangement does not constitute ineffective assistance of counsel. *See Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) ("The failure to include a meritless argument does not fall outside the 'wide range of professionally competent assistance' to which Petitioner was entitled." (citation omitted)).

## VIII.    Claims Regarding Inconsistent Testimony

Petitioner's sixth ground for habeas relief is based on what he alleges are inconsistencies between pre-trial statements of D.Q. and S.O. and their testimony at trial.   (Pet. at 39-41.) Respondent argues that this claim "does not present a federal constitutional question," and this Court agrees.

As with Petitioner's fifth ground for habeas relief, his sixth claim was not included in his direct appeal and is therefore unexhausted and procedurally defaulted.   Notwithstanding this failure to exhaust, it is apparent that Petitioner's claim is without merit. *See* 28 U.S.C. § 2254(b)(2) (a federal court may proceed to deny an unexhausted habeas claim if it is apparent that the claim is without merit).   Petitioner does not specify how the conflicting statements by D.Q. and S.O. violated his Constitutional rights or federal law.   To the extent Petitioner challenges the sufficiency of the evidence, inconsistencies in

67

statements made by D.Q. and S.O. to the police do not render their testimony incredible as a matter of law. *See Bonilla v. Portuondo*, No. 00-CV-2369 (JGK), 2004 WL 1782174, at *4 (S.D.N.Y. Aug. 9, 2004) (sole eyewitness's inconsistent statements regarding whether he saw only smoke at the shooter's side or saw a gun, failure to mention the shooter's mustache or other facial details, and admission that he did not view the shooter until after he fell to the ground did not render testimony unbelievable as a matter of law.).

Petitioner's counsel extensively cross-examined both D.Q. and S.O. regarding the inconsistencies in their pre-trial statements, and devoted significant time in summation to arguing that both witnesses were not credible as a result. (*See, e.g.*, Tr. at 951, 961-64, 970-71.) "When evaluating the sufficiency of the evidence, this Court must defer to the jury's assessment of credibility." *DeChirico v. Walker*, 558 F. Supp. 2d 355, 369 (E.D.N.Y. 2008) (citing *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996)). Petitioner's arguments regarding the inconsistencies in S.O.'s and D.Q.'s statements were put before the jury, and this Court has no reason to second guess the credibility determination that the jurors subsequently made. Accordingly, Petitioner's claim, even liberally construed, does not warrant habeas relief, and is dismissed.

68

## IX.  Claims Regarding Exclusion of DNA Evidence

Petitioner's seventh ground for relief is based on the trial court's decision to exclude evidence of semen from a third party on D.Q.'s jeans pursuant to New York's Rape Shield law.  (Pet. at 41-46.)  Petitioner argues that the evidence should not have been excluded, and that it should be re-tested to determine when it was deposited on the jeans.  (*Id.*)  This claim was presented to the Appellate Division in Petitioner's counseled appellate brief, and the Appellate Division denied the claim on the merits:

> We agree with the [trial court's] determination to exclude evidence of a semen stain not belonging to the defendant found on the jeans of one complainant pursuant to the Rape Shield Law (CPL 60.42). There was no evidence as to when or how the semen was deposited on the jeans, or who the source of the semen was. Without more, the presence of the semen was properly determined to be irrelevant, and the defendant's speculation as to when and how the stain was deposited, and whether the jeans were washed before the offenses occurred, was insufficient to overcome the exclusion of evidence of the semen pursuant to the Rape Shield Law.

*Animshaun*, 128 N.Y.S.3d at 581 (internal citations omitted). Because the Appellate Division's decision was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, Petitioner's claim for habeas relief is denied.

### A.  Legal Standard for Evidentiary Claims

"'[H]abeas corpus relief does not lie for errors of state law,' and that necessarily includes erroneous evidentiary

rulings." *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006) (internal citations omitted) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). "However, when a trial court's evidentiary exclusions take on constitutional dimensions . . . '[the court] must examine the stated reasons for the exclusion and inquire into possible state evidentiary law errors that may have deprived the petitioner of a fair trial.'" *Scrimo v. Lee*, 935 F.3d 103, 114-15 (2d Cir. 2019) (quoting *Washington v. Schriver*, 255 F.3d 45, 57 (2d Cir. 2001)).

In considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, the reviewing court should start with "the propriety of the trial court's evidentiary ruling. *Wade v. Mantello*, 333 F.3d 51, 59 (2d Cir. 2003); *see also Schriver*, 255 F.3d at 57. The inquiry "into possible state evidentiary law errors at the trial level" assists the reviewing court in "ascertain[ing] whether the appellate division acted within the limits of what is objectively reasonable." *Hawkins*, 460 F.3d at 244 (alteration in original) (quoting *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000)).

If potentially exculpatory evidence was erroneously excluded, the reviewing court then looks at "whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996) (alteration in original) (quoting

70

*United States v. Agurs*, 427 U.S. 97, 112 (1976)); *accord Hawkins*, 460 F.3d at 244 (citing *Wade*, 333 F.3d at 59 (stating that "[t]his test applies post-AEDPA")).  If, on the other hand, the state court's evidentiary ruling was correct as a matter of state evidentiary law, the habeas court's "inquiry is more limited[,]" addressing itself only to "whether the evidentiary rule is 'arbitrary or disproportionate to the purposes [it is] designed to serve.'"  *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)); *see also Holmes v. South Carolina*, 547 U.S. 319, 323-25 (2006).  A state evidentiary rule is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused."  *Scheffer*, 523 U.S. at 308.

**B.   New York's Rape Shield Law**

"Rape shield statutes have been enacted by Congress and the majority of states."  *Agard v. Portuondo*, 117 F.3d 696, 702 (2d Cir. 1997), *rev'd on other grounds*, 529 U.S. 61 (2000).  "Insofar as rape shield laws are concerned, the Supreme Court has recognized that they express the States' legitimate interest in giving rape victims 'heightened protection against surprise, harassment, and unnecessary invasion of privacy.'"  *People v. Williams*, 614 N.E.2d 730, 734 (N.Y. 1993) (quoting *Michigan v. Lucas*, 500 U.S. 145, 150 (1991)).  The relevant section of New York's Rape Shield law, which provides for an "interest of justice exception," states:

> Evidence of a victim's sexual conduct shall not be admissible in a prosecution for an offense or an attempt to commit an offense defined in article one hundred thirty of the penal law unless such evidence: . . . (5) is determined by the court after an offer of proof by the accused outside the hearing of the jury, or such hearing as the court may require, and a statement by the court of its findings of fact essential to its determination, to be relevant and admissible in the interests of justice.

CPL § 60.42; *see also People v. Jovanovic*, 700 N.Y.S.2d 156, 168 (1st Dep't 1999) (stating that the "interests of justice" exception to the rape shield law "was included in order to give courts discretion to admit what was otherwise excludable under the statute, where it is determined that the evidence is relevant").

The purpose of New York's Rape Shield law is to prohibit cross-examination about a complainant's sex life. *See, e.g., Agard*, 117 F.3d at 703 ("Rape shield laws serve the broad purpose of protecting the victims of rape from harassment and embarrassment in court, and by doing so seek to lessen women's historical unwillingness to report these crimes."); *see also* Congressional debate of the Privacy Protection for Rape Victims Act of 1978, H.R. 4272, 124 Cong. Rec. H11944 (daily ed. Oct. 10, 1978) (statement of Rep. Elizabeth Holtzman) ("[V]ictims of rape are humiliated and harassed when they report and prosecute the rape. . . . [M]any find the trial almost as degrading as the rape itself. Since rape trials become inquisitions into the victim's morality . . . it is not surprising that it is the least reported crime.").

72

The rape shield laws also serve to "reinforce the trial judge's traditional power to keep inflammatory and distracting evidence from the jury." *Agard*, 117 F.3d at 703 (citing *Sandoval v. Acevedo*, 996 F.2d 145, 148-49 (7th Cir. 1993)).

C.    **Application**

Petitioner fails to demonstrate that his trial was rendered "fundamentally unfair" by the trial court's limitation of evidence under New York's Rape Shield law regarding the presence of semen from a third-party on D.Q.'s jeans. At trial, the prosecution explained, and the trial court noted, that there was no way of determining when the semen was deposited on D.Q.'s jeans, and therefore whether the semen was deposited on D.Q.'s jeans on March 18, 2011, the date of the alleged rape, or prior to that date. (Tr. at 559-60, 565-66.) The trial court explained when making its decision that there was no evidence that anyone else was involved in intercourse with D.Q. on the date of the alleged rape, and that D.Q. testified that her clothes, including her jeans, were removed and placed in another room at the time of the rape. (*Id.* at 565-66.) The trial court also noted that because it could not be determined when the semen was deposited, it would be "too speculative to obviate the Rape Shield Law since it would suggest prior sexual activity." (*Id.* at 566.) The trial court further cited *People v. Mount*, a case in which the Appellate Division held that evidence of unrelated semen was "neither relevant nor

73

admissible in the interest of justice" when the "record contains no evidence that the victim had sexual contact with any individual other than defendant on the day in question."  727 N.Y.S.2d 819, 820 (3d Dep't 2001).

The trial court's exclusion of this evidence was well within its discretion and was not of a constitutional magnitude that deprived Petitioner of a fair trial.  Furthermore, Petitioner has failed to establish that the application of the rape shield law in this instance infringed on any of petitioner's "weighty interests."  The evidence of an unrelated individual's semen on D.Q.'s jeans, when it could not be shown when the semen had been deposited, was probative only of D.Q.'s past, purported sexual experiences, and did not make her accusations against Petitioner less credible.  In light of the "limited value of the [] evidence in illuminating any issue at trial, the state court's preclusion order was not 'beyond reason,'" and does not warrant habeas relief. *Garrison v. Lee*, 832 F. App'x 28, 31 (2d Cir. 2020) (quoting *Olden v. Kentucky*, 488 U.S. 227, 232 (1988)) (holding that trial court's exclusion of rape complainant's prostitution arrest pursuant to the New York Rape Shield law did not support federal habeas relief).  Therefore, the Appellate Division's decision rejecting Petitioner's argument is entitled to AEDPA deference, and Petitioner's habeas claim is denied.

74

**D.    Petitioner's Request for Additional DNA Testing**

Included in Petitioner's claim regarding the exclusion of the DNA evidence is an argument that his case "should be remanded to the lower court to reevaluate when the third party DNA got deposited," echoing his Fourth CPL § 440.10 motion which requested additional DNA testing.   (Pet. at 42.)   As explained in the reviewing court's decision denying Petitioner's Fourth CPL § 440.10 motion, New York's DNA testing statute "does not provide for retesting of DNA material." *People v. Dorcinvil*, 109 N.Y.S.3d 457, 458 (2d Dep't 2019).   Accordingly, because the "DNA evidence recovered from the jeans of the third victim was previously tested before trial, the [Petitioner's] request to have that evidence retested [was] denied."   (ECF No. 11-31, Decision Denying Petitioner's Fourth CPL § 440.10 Motion, at 5.)   The reviewing court went on to explain that Petitioner had "failed to establish there existed a reasonable probability that the verdict would have been more favorable to him due to DNA testing."   (*Id.*)   As a result, Petitioner's request for DNA retesting was denied.   (*Id.* at 6.)

Petitioner's claim for habeas relief based on the denial of further DNA testing is denied because it is not cognizable on habeas review.   It is well settled that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68

75

(1991).  "For that reason, habeas review is limited to claims alleging violations of federal constitutional law." *Williams v. Bradt*, No. 10-CV-3910 (DLI), 2016 WL 1273228, at *22 (E.D.N.Y. Mar. 30, 2016).  Because Petitioner's only apparent claim regarding retesting is that the state court misapplied the standard for post-conviction DNA testing in New York, his claim does not present an issue of federal constitutional law subject to this Court's review. *See id.* (dismissing petitioner's claim for retesting of DNA evidence as not cognizable on habeas review); *see also Green v. Walsh*, No. 03-CV-908 (GBD)(DCF), 2006 WL 2389306, at *20 (S.D.N.Y. Aug. 17, 2006) (petitioner's claim that state court erred in denying DNA testing was "based on a New York statutory right," and, therefore, was not "cognizable in [a] federal habeas proceeding.").

### E.  Petitioner's Discovery Claim

Petitioner additionally makes arguments that the prosecution "contravened" New York's discovery laws in connection with the DNA evidence.  (Pet. at 44-45.)  It is not clear what violation is being alleged by Petitioner, given he and his counsel clearly had access to the DNA evidence, which was discussed extensively at trial, as noted *supra*.  Regardless, Petitioner's claims that the prosecution violated CPL § 245.20 need not be examined any further, as the discovery law to which Petitioner refers did not take effect until January 1, 2020 (see N.Y. Act of Apr. 12, 2019, ch. 59, part

LLL, §§ 2, 14, 2019 N.Y. Laws 651-63, 666), and consequently has no bearing on Petitioner's trial, which took place in 2013. *See also Beckham v. Miller*, 366 F. Supp. 3d 379, 384 (E.D.N.Y. 2019) ("[A] question of discovery governed by a New York statute . . . is a matter of state law"). Petitioner's claim is therefore dismissed, as he alleges no discernible constitutional violation upon which habeas relief could be granted.

## X. Claims Regarding the Denial of the Severance Motion

Petitioner's eighth ground for habeas relief is that he was denied his right to a fair trial when the trial court refused to sever the counts related to D.Q. and S.O., and instead tried claims related to both victims in a single trial. (Pet. at 46.) Petitioner previously advanced this claim in his counseled appellate brief, arguing that the failure to sever the charges was prejudicial to Petitioner's defense and led the jury to convict Petitioner "based on the cumulative effect of the evidence rather than by its separate and distinct relevance to each incident." (Appellant Br. at 47 (internal quotation marks and citation omitted).) The Appellate Division rejected Petitioner's claim on the merits, explaining that "[b]ased on the remarkable similarity in the manner in which the crimes against both complainants were committed, joinder was appropriate pursuant CPL 200.20(2)(b) . . . [and] [a]s the offenses were properly joined in one indictment from the outset pursuant to CPL 200.20(2)(b), the court lacked the

statutory authority to sever them." *Animshaun*, 128 N.Y.S.3d at 581 (citations omitted). Because the Appellate Division's decision was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, Petitioner's claim for habeas relief is denied.

### A.    Joinder under New York State Law

C.P.L. § 200.20(2)(b) provides that two offenses are "joinable" when, "[e]ven though based upon different criminal transactions, such offenses, or the criminal transactions underlying them, are of such nature that either proof of the first offense would be material and admissible as evidence in chief upon a trial of the second, or proof of the second would be material and admissible as evidence in chief upon a trial of the first . . . ." *Id.* Here, as a matter of state law, the trial court "lacked statutory authority to sever" the counts once they were properly joined under C.P.L. § 200.20(2)(b). *People v. Bongarzone*, 507 N.E.2d 1083, 1085 (N.Y. 1987) (citations omitted).

### B.    Analysis

As an initial matter, to the extent Petitioner alleges that the trial court erred in its application of CPL § 200.20(2)(b), "he is alleging an error of state law for which habeas relief is not available." *See Rolling v. Fischer*, 433 F. Supp. 2d 336, 343 (S.D.N.Y. 2006). "Joinder of offenses rises to the level of constitutional violation only if it 'actually render[s]

78

petitioner's state trial fundamentally unfair and hence, violative of due process.'" *Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993) (alteration in original) (quoting *Tribbitt v. Wainwright*, 540 F.2d 840, 841 (5th Cir. 1976)).  Petitioner must, therefore, "go beyond the potential for prejudice and prove that *actual* prejudice resulted from the events as they unfolded during the joint trial." *Id.* at 377-78 (emphasis in original).

In Petitioner's case, the evidence regarding his crimes against D.Q. was admissible to establish his identity as S.O.'s assailant and to establish Petitioner's intent to have sexual intercourse with S.O.  *See People v. Arafet*, 920 N.E.2d 919, 922 (N.Y. 2009) (holding that "evidence of a distinctive repetitive pattern of criminal conduct may be admitted . . . to show the defendant's identity" (internal quotation marks and citation omitted)); *see also People v. Littlejohn*, 974 N.Y.S.2d 77, 84 (2d Dep't 2013) (holding that "characteristics, common to both incidents, constitute a sufficiently distinctive modus operandi to render evidence of the attack on [one victim of sexual assault] highly relevant to the issue of the identity of the perpetrator of the charged crime").  As explained by the Respondent in its briefing to the Appellate Division, both crimes shared a "distinctive" pattern of conduct:

> 1) both girls were adolescents;
> 2) defendant was driving a blue Nissan Rogue SUV when he approached [S.O.] and when he first approached

D.Q.;
3) when defendant first approached each girl, she was
walking outside unaccompanied;
4) defendant lured each girl into the SUV by offering
her a ride;
5) after defendant picked up [S.O.] and after he first
picked up D.Q., he stopped at a location and exited
the vehicle, leaving each girl momentarily alone in
the SUV;
6) defendant drove each girl to a parking garage,
intending to have sexual intercourse with her there;
and
7) defendant's conduct regarding both girls occurred
during an approximately one-week period (defendant
initially approached D.Q. on or about March 10, 2011,
he tried to have sexual intercourse with [S.O.] on
March 13, 2011, and defendant had sexual intercourse
with D.Q. on March 16 and March 18, 2011)

(ECF No. 11-19, Respondent's Brief to the Appellate Division, at

47-48.)  As a result, because of the common characteristics in the

manner in which the two crimes were committed, joinder was

appropriate under CPL § 200.20(2)(b).

Petitioner does not specify exactly what type of prejudice he

suffered based on the joinder of the claims regarding D.Q. and

S.O., but in his brief before the Appellate Division, his counsel

primarily focused on the potential that the jury would consider

the evidence of multiple offenses cumulatively.  (Appellant Br. at

48-51.)  The Court does not find the argument to be convincing.

First, Petitioner's trial involved only two victims (the

charges related to the other victim having been severed) and the

evidence related to each sexual assault was distinct, beyond

Petitioner's pattern of conduct in establishing his identity, and

could be easily compartmentalized by the jurors.  *See Herring*, 11 F.3d at 378 ("because the evidence with respect to each murder was distinct and easily compartmentalized, the risk of jury confusion at petitioner's trial was significantly limited"); *see also Screahben v. Ercole*, No. 08-CV-3230 (LTS) (HBP), 2011 WL 6306701, at *8 (S.D.N.Y. Nov. 16, 2011), *report and recommendation adopted*, 2011 WL 6325912 (S.D.N.Y. Dec. 16, 2011) ("The small number of counts involved and the discreet nature of the evidence relevant to each count diminishes the likelihood that the jury would have considered the evidence cumulatively or have been confused by what evidence was relevant to a particular count.")  In addition, although the trial court did not expressly instruct the jury that it should assess Petitioner's guilt or innocence separately with respect to each count, it did separately instruct the jury with respect to each count, i.e., it instructed the jury separately with respect to the elements of the crimes against S.O. and D.Q. the jury was asked to consider. (*See* Tr. at 1038-56.)  "Separately instructing a jury with respect to the elements of joined offenses is sufficient to prevent spill-over prejudice even where the jury has not been specifically instructed to consider multiple counts separately."  *Screahben*, 2011 WL 6306701, at *8 (citing *Shand v. Miller*, 412 F. Supp. 2d 267, 272 (W.D.N.Y. 2006)).

Finally, the prosecution's evidence concerning each of the two separate victims was strong.  Petitioner made statements to

detectives, including a videotaped statement, regarding his interactions with both victims, and both victims testified at trial. (*See generally* Tr.) Furthermore, even if the charges against the two victims had not been joined together, evidence of Petitioner's crimes against D.Q. could have been admissible in a trial regarding S.O., given the similarities in *modus operandi* between the two cases described above. *See People v. Cass*, 965 N.E.2d 918, 924 (N.Y. 2012) ("evidence of uncharged crimes and prior bad acts may be admitted to prove the specific crime charged when it tends to establish . . . (5) the identity of the person charged with the commission of the crime on trial").

For all of the above reasons, the Court concludes that any claim that Petitioner was prejudiced by joinder of the charges regarding the two victims to be little more than speculation. Because Petitioner has not made any showing of prejudice resulting from the denial of the severance motion, the Appellate Division's decision rejecting Petitioner's arguments regarding the severance motion is entitled to AEDPA deference, and Petitioner's habeas claim is denied.

### C.  Petitioner's Related Claim Regarding Photograph of His Mother's Vehicle

Petitioner's eighth ground for habeas relief, related to the denial of his severance motion, includes his argument that the trial court erred in admitting and allowing a photograph of his

mother's vehicle, the blue Nissan Rogue, to be shown to the jury. (Pet. at 46-47.)  Although Petitioner apparently brings this claim for the first time, and it is therefore unexhausted and procedurally defaulted, the Court has no difficulty dispensing with the claim on the merits.  *See* 28 U.S.C. § 2254(b)(2).

At trial, both victims testified that Petitioner drove a blue SUV.  (Tr. at 113, 239, 255.)  Detective Dixon testified that D.Q. gave him a partial license plate number for the blue vehicle, including the letters "A [and] Y" and the numbers "699."  (*Id.* at 616-17.)  Moreover, New York DMV records revealed that a Blue Nissan with license plate number EYC6699 was registered to Petitioner's mother at the address where Petitioner resided and brought D.Q.  (*Id.* at 48-49.)  In addition, Petitioner testified that the blue Nissan Rogue belonged to his mother, and he identified the photograph of the vehicle as his mother's car. (Pet. Tr. at 38-39.)  Petitioner further testified that he had driven the car before.  (*Id.* at 39.)  As a result, Petitioner's claim that the victims "never provided a license plate number" is not supported by the record.  (Pet. at 47.)

Evidence related to the blue vehicle that both victims allege Petitioner used during the commission of the crimes was clearly relevant, and Petitioner offers no reason as to why the photograph of the vehicle should not have been admitted.  Because the Court finds no erroneous evidentiary ruling to be present, it need

83

consider Petitioner's claim no further to conclude it does not support habeas relief. *See Taylor v. Connelly*, 18 F. Supp. 3d 242, 257 (E.D.N.Y. 2014) (in determining whether an alleged evidentiary error deprived petitioner of a fair trial, federal habeas court first must examine whether the evidentiary ruling was erroneous under state law). Furthermore, in the presence of overwhelming evidence of Petitioner's guilt, any error related to the admission of the photograph alone would certainly not have deprived Petitioner of his right to a fundamentally fair trial. *See Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner can show that the error deprived [him] of a fundamentally fair trial." (internal quotation marks and citation omitted)).

## XI. Claims regarding Petitioner's Guilty Plea as to Q.J.

Petitioner's ninth ground for habeas relief is that his guilty plea to the charge of rape in the first degree as to Q.J. was unfair because he only pleaded guilty "to avoid being imprisoned for a lengthy period" despite his innocence. (Pet. at 48-51.) Petitioner's tenth ground for habeas relief is that his plea was made "involuntarily" because the sentencing judge stated that he could have been sentenced as a "predicate" if he had gone to trial on the Q.J. case. (*Id.* at 51-52.) The Court analyzes Petitioner's claims together as arguing that his guilty plea was not made

84

knowingly or voluntarily.  As with many of Petitioner's other claims, these claims have not been presented in this form to any state court[20], and are therefore unexhausted and procedurally defaulted, but the Court nonetheless concludes that they are without merit regardless of any procedural defects[21].  *See* 28 U.S.C. § 2254(b)(2).

### A.   Legal Standard for the Validity of a Guilty Plea

"The well-established standard for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  *Velasquez v. Ercole*, 878 F. Supp. 2d 387, 401 (E.D.N.Y. 2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)). "A plea is considered 'intelligent if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way,' and it is considered 'voluntary

---

[20] Petitioner presented the argument about being incorrectly told he could be sentenced as a violent predicate felon as part of his first state habeas petition, of which the Respondent was not aware of any answer. Nonetheless, a record-based argument regarding the validity of the guilty plea should have been raised in a direct appeal. *See* CPL § 440.10(2)(c).

[21] "In New York, claims about the voluntariness of a guilty plea must be presented to the state court in one of three ways: a motion to withdraw the plea before sentencing, a post-judgment New York Criminal Procedure Law ("C.P.L.") § 440.10 motion in the trial court, or on direct appeal if the record permits." *McCormick v. Hunt*, 461 F. Supp. 2d 104, 109 (W.D.N.Y. 2006).  Petitioner has provided no evidence outside the record in support of his claim regarding the lack of a knowing and voluntary plea, and to the extent his challenge to his guilty plea relies on the record, any attempt by the Petitioner to bring a motion pursuant to C.P.L. § 440.10(1)(h) would be futile.  *See Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) ("Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record.")

if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weight his options rationally.'" *Manzullo v. People of New York*, No. 07-CV-744 (SJF), 2010 WL 1292302, at *5 (E.D.N.Y. Mar. 29, 2010) (quoting *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988)). "Where a defendant is represented by counsel at the plea, and enters the plea upon the advice of counsel, the voluntariness of the plea depends upon whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Velasquez*, 878 F. Supp. 2d at 401 (E.D.N.Y. 2012) (citing *Hill v. Lockhart*, 474 U.S. at 56).

A "'plea of guilty entered by one fully aware of the direct consequences' of the plea is voluntary in a constitutional sense 'unless induced by threats [], misrepresentation [], or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business.'" *Bousley v. United States*, 523 U.S. 614, 619 (1998) (quoting *Brady v. United States*, 397 U.S. 742, 755 (1970)). Furthermore, "[i]t is well established that '[a] criminal defendant's self-inculpatory statements made under oath at this plea allocution carry a strong presumption of verity . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them.'" *United*

*States v. Grzybek*, 283 F. App'x 843, 845 (2d Cir. 2008) (quoting *Adames v. United States*, 171 F.3d 728, 732 (2d Cir. 1999)).

**B.   Claims of Coercion**

As noted above, Petitioner argues that his plea was not made voluntarily because he was induced to plea guilty to avoid a consecutive sentence, and that his plea was not made knowingly because of an incorrect statement made at sentencing.   Both arguments are unpersuasive.

The Court first examines Petitioner's argument regarding the effective threat of a heavier sentence if he were to proceed to trial as to Q.J.  (Pet. at 48.)  Petitioner appeared on August 5, 2024, for what was originally scheduled to be his sentencing on the counts of which he was convicted at trial.  (Plea Tr. at 2.) Prior to beginning the proceeding, however, the sentencing court noted that Petitioner "still had the outstanding count against the other victim," Q.J., and that the sentencing court had "conveyed an offer of ten years to run concurrent with [the other sentences]."  (*Id.* at 2-3.)  The sentencing court noted that if Petitioner wished to plead guilty, the sentences on both matters would be adjourned, but if he did not, the sentencing court would "move ahead with" sentencing on the trial counts of conviction. (*Id.* at 3.)  The sentencing court alluded to the possibility that Petitioner could be sentenced to a consecutive term of imprisonment as to Q.J. but did not set forth any specifics.  (*Id.*)

Following the sentencing court's suggestion, Petitioner's counsel stated that Petitioner was "considering entering into a plea . . . to avoid consecutive jail sentences." (*Id.* at 3-4.) Petitioner's counsel argued in favor of "a lower jail sentence on the remaining untried charge regarding" Q.J., but the sentencing court did not modify its offer, stating that the "advantage" of the plea deal was that Petitioner was "not in the risk, as you stated, of consecutive time." (*Id.* at 4-6.) Subsequently, Petitioner's counsel stated that Petitioner was willing to accept the offer of a ten year sentence to run concurrent with the trial counts of conviction. (*Id.* at 6.) The prosecution objected to the offer, asking instead that Petitioner be sentenced consecutively, which the sentencing court rejected. (*Id.* at 6-7.)

Petitioner subsequently pleaded guilty and provided an allocution as to his conduct to the court. (*Id.* at 7-13.) As discussed *supra*, Petitioner initially claimed that it was not true that he had forcible intercourse with Q.J., before subsequently reversing course after an extended discussion with his lawyer and the court, and after the Court assured him of his right to a trial. (*See* Background Section IV.) After successfully completing his guilty plea allocution, the court again asked Petitioner if there was "any doubt in [his] mind as to whether [he] wish[ed] to plead

88

guilty?" (Plea Tr. at 14.)  Petitioner stated that there was not, and the court accepted his plea of guilty.  (*Id.* at 15.)

As an initial matter, the Court notes that, as compared to federal court, "[i]n New York State courts, a trial judge is permitted to participate in plea negotiations with criminal defendants." *McMahon v. Hodges*, 382 F.3d 284, 289 n.5 (2d Cir. 2004) (citing *People v. Fontaine*, 268 N.E.2d 644, 644 (N.Y. 1971)). "While participating in plea negotiations, a judge is permitted to discuss the possible sentencing repercussions of a defendant's choice to go to trial rather than plead guilty." *Id.* (citing *People v. Zer*, 714 N.Y.S.2d 257, 257 (1st Dep't 2000)). Therefore, the sentencing court's participation in the plea discussions is not an issue; instead, the issue is whether the court's statements at the plea hearing improperly coerced Petitioner into pleading guilty.

This Court notes that any defendant involved in plea negotiations suffers the threat of conviction, often of greater charges or with a greater penalty if convicted at trial, and must therefore make difficult choices.  *See, e.g., Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978) (prosecutor's offer to accept a guilty plea to a lesser charge "no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution"); *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 (1973) ("Although every

89

[plea bargain] has a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable attribute of any legitimate system which tolerates and encourages the negotiation of pleas"). Here, the Court finds no evidence that the sentencing court was motivated by "anything but a desire to fully inform petitioner of the consequences of going to trial." *Oyague v. Artuz*, 274 F. Supp. 2d 251, 258 (E.D.N.Y. 2003), *aff'd*, 393 F.3d 99 (2d Cir. 2004) (finding trial court did not coerce petitioner's plea when petitioner alleged court told him that if he went to trial and was convicted he would be facing a likely 65 years to life sentence). Rather, the trial court correctly noted that Petitioner faced a risk of a consecutive sentence on the Q.J. charges if he were convicted at trial, and offered Petitioner the possibility of a concurrent sentence in exchange for his plea of guilty. (Plea Tr. at 5-6.)   The Court further notes that Petitioner received a bargained-for ten year sentence in exchange for his plea of guilty to rape in the first degree, a Class B Violent Felony for which the maximum sentence is twenty five years. *See* N.Y. Penal Law §§ 70.02(1)(a), (3)(a).   As a result, the Court concludes that Petitioner's plea was not the product of coercion and habeas relief on this ground is not warranted.

### C.   Claims that the Plea Was Not Made Knowingly

Petitioner's next argument is that his plea was unknowing because of a misstatement at sentencing.  (Pet. at 52.)  At Petitioner's sentencing, after sentencing Petitioner to an effective sentence of 15 years in custody on the D.Q. and S.O. counts of conviction, but before sentencing Petitioner on the Q.J. conviction, the sentencing court asked Petitioner if he wished to be heard.  (Sent. Tr. at 13-16, 19.)  Petitioner stated that it was his "understanding" that "everything was running concurrent ten years" and that that was why he "copped out to that ten years," presumably regarding Q.J.  (*Id.* at 19.)  The sentencing court advised Petitioner to speak to his lawyer but explained that Petitioner had faced a decision regarding going to trial "where [he] would be subjected to consecutive time" or taking a plea for ten years, to run concurrent, but that the court "had not announced what the sentence would be as to" the D.Q. and S.O. counts.  (*Id.* at 19-20.)  The sentencing court explained that it had "made it clear that . . . regardless of what happened in the first case, even if you chose to appeal and it was reversed, you would be doing ten years."  (*Id.* at 20.)  The sentencing court continued, explaining that "had [Petitioner] gone to trial . . . [he] could have been subject . . . to a violent predicate status and then considerably more, more years."  (*Id.* at 20.)

Petitioner subsequently spoke to his attorney, but Petitioner continued to argue that he thought he would only have been sentenced to ten years on all three cases. (*Id.* at 21.)  The sentencing court further explained the possibility that Petitioner could have been sentenced as violent predicate felon if he had gone to trial and explained that the prosecution had been opposed to the possibility of a concurrent sentence at all. (*Id.* at 21-22.)  Petitioner's counsel stated that he "remember[ed] the plea that was taken here" and that he stood by the representation "made that day and now." (*Id.* at 23.)  Petitioner subsequently asked "for some leniency" and said "[t]en years is still too much time." (*Id.* at 23-24.)  The sentencing court explained that it had taken all of Petitioner's arguments into account when it allowed him to take a plea to a promised ten year sentence, and that the sentence would not be changed. (*Id.* at 24-25.)

As an initial matter, Petitioner is correct that the sentencing court erred when it stated at sentencing that he could have been sentenced as a predicate violent felony offender if he had gone to trial.  An individual may only be sentenced as a second felony offender (or second violent felony offender) "after having previously been subjected to one or more predicate felony convictions."  N.Y. Penal Law § 70.06(1)(a).  In order to qualify as a predicate felony conviction, the sentence on the predicate offense "must have been imposed before commission of the present

felony," among other things. *Id.* § 70.06(1)(b)(ii). In Petitioner's case, the commission of his felony as to Q.J.—rape in the first degree—took place on March 13, 2011, prior to his sentencing on (or the commission of) his crimes against D.Q. and S.O. (State Opp. ¶¶ 3-5.) As such, Petitioner would not have been sentenced as a second felony offender (let alone a second violent offender) if he had gone to trial on the Q.J. charges, given the D.Q. and S.O. counts of conviction would not have qualified as predicate felony offenses.

Nonetheless, any error by the sentencing court in cautioning Petitioner that he could be sentenced as a violent predicate felony offender was immaterial. First, as noted by the Respondent, the sentencing court's reference to the predicate felony sentencing provisions was made *at sentencing*, more than two months after Petitioner's guilty plea. (*See generally* Sent. Tr.) As such, the sentencing court's error could not have impacted whether Petitioner entered into the plea knowingly, because the statement was made months after Petitioner's guilty plea. *See, e.g.*, *United States ex rel. Elksnis v. Gilligan*, 256 F. Supp. 244, 253 (S.D.N.Y. 1966) (whether a guilty plea was made voluntarily "must be decided in the light of events at the time of its entry"). A review of the plea hearing transcript reveals no similar error being made at the time Petitioner entered his plea. (*See generally* Plea Tr.)

93

Furthermore, the trial court's error in stating that Petitioner would have been found a violent predicate felon at sentencing was mitigated by the fact that the sentencing court's subsequent statement about Petitioner's sentencing exposure was in fact accurate, notwithstanding the mistaken reference to violent predicate felon status. (Sent. Tr. at 22.) As noted by the Respondent, the maximum sentence for a Class B Violent Felony, such as rape in the first degree, is 25 years. *See* N.Y. Penal Law §§ 70.02(1)(a), (3)(a) (stating that Rape in the First Degree is a Class B Violent Felony and that the maximum sentence for a Class B Violent Felony is 25 years incarceration). Therefore, the sentencing court's statement that Petitioner "would have been subject . . . to 25 years incarceration" and that the sentence "could run consecutive" was, therefore, legally correct, even if the court mistakenly discussed Petitioner's risk of being sentenced as a violent predicate felon. As a result, the trial court's brief and erroneous reference to the predicate felon sentencing provisions, months after Petitioner's guilty plea, did not impact whether Petitioner's guilty plea was made knowingly. Habeas relief is not warranted on Petitioner's claim.

### D.   Ineffective Assistance of Counsel

As discussed above, "[w]here a defendant is represented by counsel at the plea, and enters the plea upon the advice of counsel, the voluntariness of the plea depends upon whether

94

counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Velasquez*, 878 F. Supp. 2d at 401 (citing *Hill v. Lockhart*, 474 U.S. at 56).   Although Petitioner has not raised an ineffective assistance of counsel claim with regards to his plea agreement, the Court will briefly examine the record to determine whether his counsel's representation in connection with the plea agreement fell below "an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).   The Court's review reveals no error.

Counsel had good reason to recommend that Petitioner plead guilty to the rape in the first degree charge in the instant case. Q.J., who was acquainted with Petitioner, identified Petitioner as the individual who raped her, stated that he had done so after picking her up in a Blue Nissan Rogue, and reported her rape to the NYPD on the same day it occurred.   (H. Tr. at 5-26.)   After receiving *Miranda* warnings, Petitioner admitted to the broad outlines of what occurred in his statement to Detective Henry, admitting that he knew Q.J., picked her up in the blue Nissan Rogue, and then had sex with her in the parking lot in the rear of his aunt's house.   (*Id.* at 15.)   Petitioner's DNA was also found on Q.J.  (*See* ECF No. 11-2, December 11, 2012, Hearing Transcript, at 17.)   As noted by Petitioner's counsel, Petitioner's primary defense with regards to Q.J. was arguing that the sex was consensual, as he did not deny having intercourse with Q.J.   (*Id.*

at 15.)   Accordingly, because Petitioner's defense turned entirely on the jury's credibility determination, to the extent Petitioner's counsel recommended he plead guilty, such a recommendation did not fall below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Ultimately, Petitioner was able to avoid what could have been a 25 year sentence, consecutive to his previous sentences for D.Q. and S.O., and received a 10 year concurrent sentence which resulted in no additional prison time for his plea as to Q.J.   Therefore, the Court does not find that Petitioner's counsel's performance was ineffective or rendered his guilty plea involuntary.

In conclusion, the Court finds that Petitioner's arguments regarding his guilty plea are without merit, cannot support habeas relief, and are accordingly denied and dismissed.

## XII. Remaining Claims

Petitioner's remaining claims are that (1) he has maintained his innocence as to all three victims; and (2) his acquittal of a Maryland traffic violation constitutes "newly discovered evidence" warranting suppression of evidence.   (Pet. at 51-52, 55-57.) Petitioner previously raised both claims in his Fourth CPL § 440.10 Motion, the reviewing court rejected both claims, and the Appellate Division denied Petitioner's application for leave to appeal. (State Opp. ¶¶ 147-49.)   Neither claim warrants habeas relief, and both are dismissed.

As an initial matter, Petitioner's claim that he has maintained his innocence is not a basis for habeas relief, in and of itself. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993) ("our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits"). Petitioner's brief statement that he has maintained his innocence, made without any evidence or explanation, cannot support habeas relief. Even if Petitioner were attempting to utilize the statement as a way to permit this Court to review a procedurally defaulted claim, he would fall short of the standard. "To establish actual innocence, petitioner must demonstrate that 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.'" *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* at 623 (citation omitted). Petitioner offers no evidence to suggest that he was actually innocent of the crimes of which he was convicted, and, as discussed several times in this order, the evidence offered against Petitioner was overwhelming. As a result, the Court need not examine Petitioner's claim that he has maintained his innocence any further to conclude it does not merit habeas relief.

97

Petitioner's argument that his acquittal on a Maryland traffic violation somehow warrants suppression of the evidence gathered for his New York cases is likewise without merit. Petitioner explains that he was arrested for a traffic violation in Maryland on October 28, 2010, posted bail on October 29, 2010, and then moved back to New York to live with his mother a few days thereafter. (Pet. at 55.) Petitioner subsequently missed a court hearing on February 14, 2011, which he claims was caused by his lack of funds to travel, and a bench warrant was issued by the Maryland court based upon his failure to appear. (*Id.*) Petitioner explains that the bench warrant was lodged as an active detainer against him while he was in custody in New York after his arrest on March 28, 2011, and that he subsequently requested final disposition of the arrest warrant on May 27, 2019. (*Id.* at 56.) Petitioner was found not guilty on the traffic case on November 4, 2019. (*Id.* at 57.) Petitioner argues that because the evidence in his New York case was obtained after his arrest in the traffic case (and subsequent bench warrant being issued) the evidence is invalid and must be suppressed as having been obtained in violation of the Fourth Amendment. (*Id.*)

As an initial matter, to the extent Petitioner believes his Maryland arrest somehow interacted with his New York arrest and resulted in a Fourth Amendment violation, the Court's analysis in Discussion Section II, *supra*, applies with equal force. Petitioner

98

was afforded access to New York's procedures to remedy any Fourth
Amendment violations and cannot establish that an unconscionable
breakdown in the state processes prevented him from presenting his
claims.  *See, e.g.*, *Nunez v. Conway*, 923 F. Supp. 2d 557, 568
(S.D.N.Y. 2013).  As a result, under the rule of *Stone v. Powell*,
Petitioner may not be granted federal habeas corpus relief.  428
U.S. at 495.

Even setting aside the rule of *Stone v. Powell*, Petitioner
offers no logical link between his arrest for a traffic violation
in Maryland and the evidence collected by the NYPD in the instant
case.  Petitioner does not claim that his arrest on March 28, 2011,
was based on the bench warrant issued by the Maryland court, for
instance – instead he argues that it was based on a robbery for
which he was a subject in New York.  (Pet. at 28.)  Because the
Maryland case did not provide the probable cause for Petitioner's
arrest, the validity or invalidity of his arrest for the traffic
violation would have no bearing on his arrest in New York.
Furthermore, Petitioner's acquittal in Maryland would not even
necessarily render his arrest in that state invalid.  The validity
of an arrest does not depend upon an ultimate finding of guilt or
innocence and thus the fact of Petitioner's subsequent acquittal
does not defeat a finding that probable cause once existed for his
arrest.  *See Pierson v. Ray*, 386 U.S. 547, 555 (1967) (discussing
the standard for false arrest claims).  Accordingly, Petitioner's

claim that his acquittal in Maryland requires the suppression of evidence later collected in New York is without merit, cannot support habeas relief, and is denied and dismissed.

## CONCLUSION

For the foregoing reasons, Petitioner's Section 2254 petition is respectfully **denied** and **dismissed** in its entirety.  Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is denied and shall not issue.  *See* 28 U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); Rules Governing Section 2254 and 2255 Cases in the United States District Courts, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

The Clerk of Court is respectfully requested to enter judgment in favor of Respondent and close this case.  In accordance with 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal from this order would not be taken in good faith and thus denies in forma pauperis status for the purposes of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).  The Clerk of Court is requested to serve a copy of this Memorandum and Order and the Judgment on Petitioner and note such service on the docket by September 25, 2024.

**SO ORDERED**

Dated:      September 23, 2024
            Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York

101